**Edwin D. LEE, Plaintiff,**

v.

**UNITED STATES GOVERNMENT and Internal Revenue Service and Jerome Kurtz, Commissioner, Internal Revenue Service, Defendants.**

**Civ. A. No. 79–739.**

United States District Court, W. D. Pennsylvania.

July 15, 1980.

Francis X. Caiazza, New Castle, Pa., for plaintiff.

Thomas A. Daley, Asst. U. S. Atty., Pittsburgh, Pa., Gregory S. Hrebiniak Dept. of Justice Trial Atty., Tax Div., Washington, D. C., for defendants.

## OPINION

TEITELBAUM, District Judge:

This is an action for refund of $91.00 paid by plaintiff for withholding and FICA taxes on wages paid to his employees for the first quarter of 1973. The plaintiff, Edwin D. Lee, is a self–employed farmer and carpenter and a member of the Old Order Amish religion. During the years 1970 through 1977, Mr. Lee employed and paid wages to several Old Order Amish employees; however, he failed to file quarterly employment tax returns or annual unemployment tax returns, to withhold income tax or FICA tax from his employees' wages, or to pay the employer's portion of the employee's FICA or FUTA taxes. In 1978, the Internal Revenue Service assessed employment taxes in amounts exceeding $27,000. In 1979, plaintiff paid $91.00 of this amount, representing the assessment for the first quarter of 1977. His subsequent claim for refund was disallowed. The present suit was filed in July of 1979, seeking declaratory and injunctive relief from payment of the tax, alleging the payment of the tax is a violation of his First Amendment right to the free exercise of his religion.

Once again, the Court is called upon to examine the beliefs of the Amish in the context of the First Amendment. The Old Order Amish occupy a respected and time–honored position in the history of this country. Their origins date back to the 16th century Swiss Anabaptists who separated themselves from institutionalized churches to preserve a non–competitive, closely–knit community life emphasizing "goodness" and community welfare. Throughout their history, the Amish have maintained this ideal. Despite continuing encroachment of the contemporary, worldly society, they have remained independent of society, yet interdependent among themselves. In a society, witnessing the gradual erosion of such values, their efforts are worthy of preservation. Whether or not the preservation of their values falls within the present context–exemption from taxes based upon these admirable religious convictions–is the issue to be decided.

The Old Order Amish have been past recipients of both legislative and judicial grace. Section 1402(g) of the Internal Revenue Code exempts from payment of, *inter alia*, self–employment FICA taxes religious groups who provide their own form of old age and disability insurance to members of their sects.[1] In *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Supreme Court exempted the group from compulsory public school attendance beyond the age of 13, stressing the importance of recognizing and preserving the Order as a "highly successful social unit within our society" which "rejects public welfare in any of its usual modern forms." Plaintiff relies on the reasoning behind *Yoder* and 1402(g) for his argument to extend the exemption of 1402(g) and thereby relieve members of this sect from the requirement of withholding FICA taxes from Amish employees or from paying the employer's portion of FICA or FUTA taxes. His rationale is simple yet sincere: it is a sin to fail to provide for or to allow another to provide for your own people. "But if any provide not . . . for those of his own house, he hath denied the faith and is worse than an infidel." (I Timothy 5:8). Accordingly,

1. 26 U.S.C. § 1402(g) Exemption.–Any individual may file an application (in such form and manner, and with such official, as may be prescribed by regulations under this chapter) for an exemption from the tax imposed by this chapter if he is a member of a recognized religious sect or division thereof and is an adherent of established tenets or teachings of such sect or division by reason of which he is conscientiously opposed to acceptance of the benefits of any private or public insurance which makes payments in the event of death, disability, old–age, or retirement or makes payments toward the cost of, or provides services for, medical care (including the benefits of any insurance system established by the Social Security Act).

they have a built–in, fool–proof social security system of their own–they care for their aged, their sick, their unemployed. They neither need nor would be permitted to accept any form of social security payments from outside their self–sufficient community. Not only is it considered a sin to *accept*, it is also considered a sin to *pay*, for to pay is to deny their faith. It is this crucial distinction which weakens an otherwise strong argument opposing Lee's claims.

The government concedes both the worthiness and the sincerity of the Amish beliefs, yet they counter with the inherent power of the government to tax. While recognizing the precedential weight of 1402(g) as a rationale for extending the exemption to include all forms of social security taxes, they argue the difference in the function of the tax. The 1402(g) exemption falls under the "income tax" provision of the Social Security tax system. The taxes at issue here–the employer's share of FICA, FUTA, and deduction of his employees' FICA taxes for which he is personally liable–are termed "excise taxes," a flat fee imposed upon an employer for the privilege of doing business, totally unrelated to the purpose served by the tax. These taxes are a contribution to a "general welfare" fund to provide for *all* who become dependent on society. As benefits under the SSA are not automatic, accruing only upon the filing of an application for receipt of benefits, plaintiff Lee need only refuse the benefits to avoid violating the precepts of his faith. This distinction between a self–employment payment as "income tax" and deduction and payment of an employee's tax as an "excise tax" is a distinction without a difference and raising it does little credit to the government agencies concerned. Calling a rose a violet hardly changes its odor. The distinction overlooks the key contention: Payment of the tax is the sin that burdens the free exercise of the Amishman's religion.

The free exercise of one's religion is a fundamental, natural, absolute right, firmly entrenched in the foundation and the history of our legal system. Courts have given the First Amendment a broad interpretation in light of its history and the evils it was designed to prevent. When this right has come into conflict with an equally valued and respected governmental interest, the Court will apply a balancing test to determine which must yield to the other. A pattern has emerged from these conflicts which has set guidelines for determining the predominate interest. Courts have determined that while religious *beliefs* may be inviolate, religious *conduct* is not; therefore conduct jeopardizing public safety, peace, or order will fall to Governmental interest. *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (polygamy not protected by free exercise clause), *Prince v. Mass.*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (child labor law upheld against 9 year old child distributing religious pamphlets.) Failure to pay taxes is alleged to jeopardize the public welfare.

The government contends there is no constitutional right to be immune from taxes. The power to tax is a legitimate exercise of the government that overrides individual preference. The government draws an analogy to the challenges to the Selective Service laws as an interference with the free exercise of religion. The analogy is well taken: The power to conscript for war is also a legitimate government exercise. As in the present case, a legislative exemption was extended to those who, because of religious principles, opposed the concept of war. The cases cited by the government were attempts to expand the exemption to cover conscientious objectors who opposed particular wars (specifically, the Viet Nam war). *Gillette v. U. S.*, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971), *Loewing v. U. S.*, 392 F.2d 218 (10th Cir. 1968). The expansion was denied because of the administrative burden of distinguishing valid claims from invalid ones and the political overtones inherent in such decisions. The present case presents no such problem. The group seeking exemption is clearly defined, long–recognized, and unquestionably sincere. Nor is there a danger of an open-ended category capable of uncontrolled ex-

pansion. The Old Order Amish, and groups like them, are small groups whose labor generates a small amount of wages and taxes. The loss of revenue from granting the exemption would be negligible. Clearly the granting of the exemption does not interfere with the establishment or preservation of the general welfare of the public. The history and intent of the 1402(g) exemption further underscores this conclusion:

> We believe that an exemption from Social Security taxes ... would be justifiable only in cases where it is amply clear that an individual cannot accept the benefits of insurance, including social security benefits, without renouncing the basic tenet of his religion ... (p. 101).
>
> ... an exemption may be granted only if the Secretary of Health, Education & Welfare makes the following findings with respect to the religious sect: ... That it is the practice and has been for a period of time which the Secretary deems to be substantial, for members of such sect or division thereof to make provisions for their dependent members which, in the judgment of the Secretary, is reasonable in view of the general level of living of the members of the Sect or division thereof. (p. 228)
>
> H.R.Rep. No. 213, 89th Cong. 1st Sess. (1965) pp. 101 & 228.

The Congress seems to have concluded that where a group is both religiously opposed to this form of public welfare *and* has provided its own alternative source of remedial welfare, the governmental interest has been protected and is therefore not required.

It was this same two–prong approach applied by the Supreme Court in *Wisconsin v. Yoder, supra,* that tipped the balance of interests in favor of the Yoders, an Amish family challenging the burden of a state compulsory school attendance law on the free exercise of their religion. The combination of the burden on their religious exercise and the long standing tradition of providing alternative vocational training within their own community obviated the need for public education, and thus over–rode the

compelling state interest to provide for the general welfare via compulsory public school attendance to age 16.

The government points out a legislative caution in the 1402(g) exemption against any broadening of its coverage:

> The proposed exemption would be limited to the self employment tax under social security since those persons for whom the payment of social security taxes appears to be unreconcilable with their religious convictions also, by reason of their religious beliefs, limit their work almost entirely to farming and to certain other self–employment. H.R.Rep. No. 213, *supra.*

■ Again, the point is relevant, but it misses the mark. Mr. Lee has branched out from farming to employing others in his carpenter work. Is he to be penalized for not confining his work to self–employment? Clearly Congress has the power to both grant an exemption and to restrict its expansion, but the issue is the balancing of interests—which is to be paramount? When there is a burden on the free exercise of religion, only a "compelling" state interest will justify the state's constitutional power to regulate. *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 382, 9 L.Ed.2d 405 (1963), *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), *Wisconsin v. Yoder, supra.*

As *Wisconsin v. Yoder* indicates, the *combination* of the burden on the free exercise of one's religion and the alternative method of achieving the same end will override the state's interest in regulating.

*Sherbert v. Verner* is on point–a South Carolina statute denied unemployment compensation benefits to a Seventh Day Adventist who, because of religious beliefs, could not work on Saturday and, therefore, could not find a job. The Court, upon weighing the competing interests, found the Seventh Day Adventists in the same dilemma as Mr. Lee–

> Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to

forego that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship. 374 U.S. 398 at 404, 83 S.Ct. 1790 at 1794, 10 L.Ed.2d 965.

The Court rejected the Government's argument that the filing of fraudulent claims feigning religious objections to Saturday work would dilute the unemployment fund and disrupt the scheduling of work. The possibility of such abuse was of insufficient weight to counterbalance the burden on appellant's free exercise of religion.

It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, "[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation," *Thomas v. Collins*, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430.

In dismissing the government's argument the Court stressed the need for the government to show *both* a burden on a compelling state interest and an alternative means to combat it. Both were absent in *Sherbert*; both are absent here. The exemption of 1402(g), with its complementary waiver of benefit forms, the tightly circumscribed definition of the group, and the reasoning for its exemption precludes the possibility of abuse by providing a readily available method of combatting it. Thus, even if it were arguable that the State's interest in taxing an employer to provide a general welfare fund for protection against life's misfortunes is a "compelling interest," both the burden on Mr. Lee's religious exercise and the alternative forms of compensating for the state's interest would combine to tip the scales in favor of Mr. Lee.

The Court in *Sherbert* distinguishes its decision from *Braunfeld v. Brown*, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961); the comparison is relevant here. In *Braunfeld*, an Orthodox Jew challenged the state's Sunday closing law as an undue burden on the free exercise of his religion. Mr. Braunfeld's position was not unlike that of Ms. Sherbert's and Mr. Lee's—he could forego his religious principles and do business six days a week or practice his religion and cut back his business to five days a week. The distinction, however, is crucial—Mr. Braunfeld's free exercise would cost him one day's sales; the loss of Sherbert and Lee (a job in Sherbert's case and any employment requiring the help of others by Mr. Lee) is a far greater hardship. The insignificant financial hardship suffered by Jewish merchants, coupled with the lack of any alternative means for the state to provide a uniform day of rest (the "compelling state interest"), and the economic disadvantage to merchants not exempted from Sunday closings was sufficient to override the burden on the religious exercise. In the present case, the burden on the free exercise is great, and there are alternative means both for achieving any "compelling" state interest and for combatting any abuses that may arise. Thus, plaintiff Lee, and employers who fall within the carefully circumscribed definition provided in 1402(g), are relieved from paying the employer's share of FICA and FUTA as it is an unconstitutional infringement upon the free exercise of their religion.

In view of the foregoing opinion the tax is declared invalid and unconstitutional. Plaintiff has also requested injunctive relief; however, 26 U.S.C. § 7421(a) of the Internal Revenue Code specifically indicates that injunctive relief is to be granted sparingly and only in exceptional circumstances. Therefore, this Court must deny plaintiff's request for injunctive relief with the knowledge that the government has agreed not to collect such taxes during the pendency of this litigation and in the belief that future collection activities will be circumscribed by the holding of this case. If this belief should prove to be unfounded, further Court relief could be requested.

The foregoing shall constitute findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a). An appropriate order will issue.