## UNITED STATES *v.* LEE

No. 80–767.   Argued November 2, 1981—Decided February 23, 1982

BURGER, C. J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, BLACKMUN, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 261.

*Deputy Solicitor General Wallace* argued the cause for the United States. With him on the briefs were *Solicitor General Lee*, former *Solicitor General McCree, Acting Assistant Attorney General Murray, Stuart A. Smith*, and *Gary R. Allen*.

*Francis X. Caiazza* argued the cause and filed a brief for appellee.*

---

*\*William Bentley Ball* and *Phillip J. Murren* filed a brief for the National Committee for Amish Religious Freedom as *amicus curiae* urging affirmance.

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We noted probable jurisdiction to determine whether imposition of social security taxes is unconstitutional as applied to persons who object on religious grounds to receipt of public insurance benefits and to payment of taxes to support public insurance funds. 450 U. S. 993 (1981). The District Court concluded that the Free Exercise Clause prohibits forced payment of social security taxes when payment of taxes and receipt of benefits violate the taxpayer's religion. We reverse.

I

Appellee, a member of the Old Order Amish, is a farmer and carpenter. From 1970 to 1977, appellee employed several other Amish to work on his farm and in his carpentry shop. He failed to file the quarterly social security tax returns required of employers, withhold social security tax from his employees, or pay the employer's share of social security taxes.[1]

In 1978, the Internal Revenue Service assessed appellee in excess of $27,000 for unpaid employment taxes; he paid $91—

---

[1] The Social Security Act and its subsequent amendments provide a system of old-age and unemployment benefits. 26 U. S. C. § 3101 et seq. (1976 ed. and Supp. III). These benefits are supported by various taxes, including, relevant to this appeal, the Federal Insurance Contributions Act (FICA) and the Federal Unemployment Tax Act (FUTA) taxes. The FICA tax is a tax paid in part by employees through withholding, 26 U. S. C. § 3101 (1976 ed., Supp. III), and in part by employers through an excise tax. 26 U. S. C. § 3111 (1976 ed., Supp. III). The FUTA tax is an excise tax imposed only on employers. 26 U. S. C. § 3301. Both taxes are based on the wages paid to employees, and the recordkeeping and transmittal of funds are obligations of the employer. Only the FICA tax is collected from self-employed individuals.

In this case appellee failed to pay the employer's portion of FICA and FUTA taxes and failed to withhold his employee's contributions to the FICA taxes. An employer is liable for payment of the employee's share of FICA taxes whether or not he withholds the required amount of the employee's contribution. 26 U. S. C. § 3102(b).

the amount owed for the first quarter of 1973—and then sued in the United States District Court for the Western District of Pennsylvania for a refund, claiming that imposition of the social security taxes violated his First Amendment free exercise rights and those of his Amish employees.[2]

The District Court held the statutes requiring appellee to pay social security and unemployment insurance taxes unconstitutional as applied. 497 F. Supp. 180 (1980). The court noted that the Amish believe it sinful not to provide for their own elderly and needy and therefore are religiously opposed to the national social security system.[3] The court also accepted appellee's contention that the Amish religion not only prohibits the acceptance of social security benefits, but also bars all contributions by Amish to the social security system. The District Court observed that in light of their beliefs, Congress has accommodated self-employed Amish and self-employed members of other religious groups with similar beliefs by providing exemptions from social security taxes. 26 U. S. C. § 1402(g).[4] The court's holding was based on both

---

[2] Appellee also requested injunctive relief to prevent the Commissioner of Internal Revenue from attempting to collect the unpaid balance of the assessments. Under the Internal Revenue Code, injunctive relief is to be granted sparingly and only in exceptional circumstances. 26 U. S. C. § 7421(a) (1976 ed., Supp. III). The District Court therefore denied injunctive relief, but noted that should the Government attempt to collect the remaining payments "further Court relief could be requested." 497 F. Supp. 180, 184 (1980).

[3] Appellee indicates that his scriptural basis for this belief was: "But if any provide not . . . for those of his own house, he hath denied the faith, and is worse than an infidel." (I Timothy 5: 8.)

[4] Title 26 U. S. C. § 1402(g) provides, in part:

"(1) Exemption

Any individual may file an application . . . for an exemption from the tax imposed by this chapter if he is a member of a recognized religious sect or division thereof and is an adherent of established tenets or teachings of such sect or division by reason of which he is conscientiously opposed to acceptance of the benefits of any private or public insurance which makes payments in the event of death, disability, old-age, or retirement or makes

the exemption statute for the self-employed and the First Amendment; appellee and others "who fall within the carefully circumscribed definition provided in 1402(g) are relieved from paying the employer's share of [social security taxes] as it is an unconstitutional infringement upon the free exercise of their religion."[5] 497 F. Supp., at 184.

Direct appeal from the judgment of the District Court was taken pursuant to 28 U. S. C. § 1252.

## II

The exemption provided by § 1402(g) is available only to self-employed individuals and does not apply to employers or employees. Consequently, appellee and his employees are not within the express provisions of § 1402(g). Thus any exemption from payment of the employer's share of social security taxes must come from a constitutionally required exemption.

## A

The preliminary inquiry in determining the existence of a constitutionally required exemption is whether the payment

---

payments toward the cost of, or provides services for, medical care (including the benefits of any insurance system established by the Social Security Act)."

In order to qualify for the exemption, the applicant must waive his right to all social security benefits and the Secretary of Health and Human Services must find that the particular religious group makes sufficient provision for its dependent members.

[5] The precise basis of the District Court opinion is not clear. The court recognized that on its face § 1402(g) does not apply to appellee because he is not a self-employed individual. The District Court nonetheless used the language of § 1402(g) to provide an exemption for appellee. The court's decision to grant appellee an exemption, however, appears to be based on its view that the statute was unconstitutional as applied. Consequently, this Court has jurisdiction under 28 U. S. C. § 1252 to hear the appeal. See also *United States* v. *American Friends Service Committee*, 419 U. S. 7, 9, n. 4 (1974).

of social security taxes and the receipt of benefits interferes with the free exercise rights of the Amish. The Amish believe that there is a religiously based obligation to provide for their fellow members the kind of assistance contemplated by the social security system. Although the Government does not challenge the sincerity of this belief, the Government does contend that payment of social security taxes will not threaten the integrity of the Amish religious belief or observance. It is not within "the judicial function and judicial competence," however, to determine whether appellee or the Government has the proper interpretation of the Amish faith; "[c]ourts are not arbiters of scriptural interpretation." *Thomas* v. *Review Bd. of Indiana Employment Security Div.*, 450 U. S. 707, 716 (1981).[6] We therefore accept appellee's contention that both payment and receipt of social security benefits is forbidden by the Amish faith. Because the payment of the taxes or receipt of benefits violates Amish religious beliefs, compulsory participation in the social security system interferes with their free exercise rights.

The conclusion that there is a conflict between the Amish faith and the obligations imposed by the social security system is only the beginning, however, and not the end of the inquiry. Not all burdens on religion are unconstitutional. See, *e. g., Prince* v. *Massachusetts*, 321 U. S. 158 (1944); *Reynolds* v. *United States*, 98 U. S. 145 (1879). The state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental inter-

---

[6] This is not an instance in which the asserted claim is "so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise Clause." *Thomas* v. *Review Bd. of Indiana Employment Security Div.*, 450 U. S., at 715. At least one other religious organization has sought an exemption under § 1402(g). See also *Henson* v. *Commissioner*, 66 T. C. 835 (1976) (member of Sai Baba denied exemption because although opposed to insurance on religious grounds, the faith did not provide for its dependent members).

est. *Thomas, supra; Wisconsin* v. *Yoder,* 406 U. S. 205 (1972); *Gillette* v. *United States,* 401 U. S. 437 (1971); *Sherbert* v. *Verner,* 374 U. S. 398 (1963).

## B

Because the social security system is nationwide, the governmental interest is apparent. The social security system in the United States serves the public interest by providing a comprehensive insurance system with a variety of benefits available to all participants, with costs shared by employers and employees.[7] The social security system is by far the largest domestic governmental program in the United States today, distributing approximately $11 billion monthly to 36 million Americans.[8] The design of the system requires support by mandatory contributions from covered employers and employees. This mandatory participation is indispensable to the fiscal vitality of the social security system. "[W]idespread individual voluntary coverage under social security . . . would undermine the soundness of the social security program." S. Rep. No. 404, 89th Cong., 1st Sess., pt. 1, p. 116 (1965). Moreover, a comprehensive national social security system providing for voluntary participation would be almost a contradiction in terms and difficult, if not impossible, to administer. Thus, the Government's interest in as-

---

[7] The Social Security Act was enacted in 1935 to provide supplementary retirement benefits. Over the following 45 years coverage has broadened, and the cost of the system has increased dramatically. See A. Abraham & D. Kopelman, Federal Social Security (1979). In 1939 the Act was amended to provide insurance benefits for retired workers, auxiliaries of retired workers, and survivors of deceased workers. In 1950 coverage was extended to self-employed workers and to select other employees previously excluded. In 1954 and 1956 disability benefits were added and in 1965 Medicare benefits were made available to participants in the system.

[8] National Commission on Social Security, Social Security in America's Future 5 (1981).

suring mandatory and continuous participation in and contribution to the social security system is very high.[9]

## C

The remaining inquiry is whether accommodating the Amish belief will unduly interfere with fulfillment of the governmental interest. In *Braunfeld* v. *Brown*, 366 U. S. 599, 605 (1961), this Court noted that "to make accommodation between the religious action and an exercise of state authority is a particularly delicate task . . . because resolution in favor of the State results in the choice to the individual of either abandoning his religious principle or facing . . . prosecution." The difficulty in attempting to accommodate religious beliefs in the area of taxation is that "we are a cosmopolitan nation made up of people of almost every conceivable religious preference." *Braunfeld, supra,* at 606. The Court has long recognized that balance must be struck between the values of the comprehensive social security system, which rests on a complex of actuarial factors, and the consequences of allowing religiously based exemptions. To maintain an organized society that guarantees religious freedom to a great variety of faiths requires that some religious practices yield to the common good. Religious beliefs can be accommodated, see, *e. g., Thomas, supra; Sherbert, supra,* but there is a point at which accommodation would "radically restrict the operating latitude of the legislature." *Braunfeld, supra,* at 606.[10]

Unlike the situation presented in *Wisconsin* v. *Yoder, supra,* it would be difficult to accommodate the comprehen-

---

[9] The fiscal soundness of the social security system has been the subject of several studies and of congressional concern. See, *e. g.,* Congressional Budget Office, Paying for Social Security: Funding Options for the Near Term (1981).

[10] See, *e. g., Follett* v. *Town of McCormick,* 321 U. S. 573 (1944) (preacher not entitled to be free from taxes); *Murdock* v. *Pennsylvania,* 319 U. S. 105, 112 (1943) (same).

sive social security system with myriad exceptions flowing from a wide variety of religious beliefs. The obligation to pay the social security tax initially is not fundamentally different from the obligation to pay income taxes; the difference—in theory at least—is that the social security tax revenues are segregated for use only in furtherance of the statutory program. There is no principled way, however, for purposes of this case, to distinguish between general taxes and those imposed under the Social Security Act. If, for example, a religious adherent believes war is a sin, and if a certain percentage of the federal budget can be identified as devoted to war-related activities, such individuals would have a similarly valid claim to be exempt from paying that percentage of the income tax. The tax system could not function if denominations were allowed to challenge the tax system because tax payments were spent in a manner that violates their religious belief. See, *e. g.*, *Lull* v. *Commissioner*, 602 F. 2d 1166 (CA4 1979), cert. denied, 444 U. S. 1014 (1980); *Autenrieth* v. *Cullen*, 418 F. 2d 586 (CA9 1969), cert. denied, 397 U. S. 1036 (1970). Because the broad public interest in maintaining a sound tax system is of such a high order, religious belief in conflict with the payment of taxes affords no basis for resisting the tax.

## III

Congress has accommodated, to the extent compatible with a comprehensive national program, the practices of those who believe it a violation of their faith to participate in the social security system. In § 1402(g) Congress granted an exemption, on religious grounds, to self-employed Amish and others.[11] Confining the § 1402(g) exemption to the self-

---

[11] The District Court read this as extending to the present claims. We need not decide whether the Free Exercise Clause compelled an exemption as provided by § 1402(g); Congress' grant of the exemption was an effort toward accommodation. Nor do we need to decide whether, if Congress · had, as the District Court believed, intended § 1402(g) to reach this case, conflicts with the Establishment Clause would arise.

employed provided for a narrow category which was readily identifiable. Self-employed persons in a religious community having its own "welfare" system are distinguishable from the generality of wage earners employed by others.

Congress and the courts have been sensitive to the needs flowing from the Free Exercise Clause, but every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs. When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity. Granting an exemption from social security taxes to an employer operates to impose the employer's religious faith on the employees. Congress drew a line in § 1402(g), exempting the self-employed Amish but not all persons working for an Amish employer. The tax imposed on employers to support the social security system must be uniformly applicable to all, except as Congress provides explicitly otherwise.[12]

Accordingly, the judgment of the District Court is reversed, and the case is remanded for proceedings consistent with this opinion.

*Reversed and remanded.*

JUSTICE STEVENS, concurring in the judgment.

The clash between appellee's religious obligation and his civic obligation is irreconcilable. He must violate either an Amish belief or a federal statute. According to the Court, the religious duty must prevail unless the Government shows

---

[12] We note that here the statute compels contributions to the system by way of taxes; it does not compel anyone to accept benefits. Indeed, it would be possible for an Amish member, upon qualifying for social security benefits, to receive and pass them along to an Amish fund having parallel objectives. It is not for us to speculate whether this would ease or mitigate the perceived sin of participation.

that enforcement of the civic duty "is essential to accomplish an overriding governmental interest." *Ante*, at 257–258. That formulation of the constitutional standard suggests that the Government always bears a heavy burden of justifying the application of neutral general laws to individual conscientious objectors. In my opinion, it is the objector who must shoulder the burden of demonstrating that there is a unique reason for allowing him a special exemption from a valid law of general applicability.

Congress already has granted the Amish a limited exemption from social security taxes. See 26 U. S. C. § 1402(g). As a matter of administration, it would be a relatively simple matter to extend the exemption to the taxes involved in this case. As a matter of fiscal policy, an enlarged exemption probably would benefit the social security system because the nonpayment of these taxes by the Amish would be more than offset by the elimination of their right to collect benefits. In view of the fact that the Amish have demonstrated their capacity to care for their own, the social cost of eliminating this relatively small group of dedicated believers would be minimal. Thus, if we confine the analysis to the Government's interest in rejecting the particular claim to an exemption at stake in this case, the constitutional standard as formulated by the Court has not been met.

The Court rejects the particular claim of this appellee, not because it presents any special problems, but rather because of the risk that a myriad of other claims would be too difficult to process. The Court overstates the magnitude of this risk because the Amish claim applies only to a small religious community with an established welfare system of its own.[1]

---

[1] The Amish claim is readily distinguishable from the typical claim to an exemption from general tax obligations on the ground that the taxpayer objects to the government's use of his money; in the typical case the taxpayer is not in any position to supply the government with an equivalent substitute for the objectionable use of his money.

Nevertheless, I agree with the Court's conclusion that the difficulties associated with processing other claims to tax exemption on religious grounds justify a rejection of this claim.[2] I believe, however, that this reasoning supports the adoption of a different constitutional standard than the Court purports to apply.

The Court's analysis supports a holding that there is virtually no room for a "constitutionally required exemption" on religious grounds from a valid tax law that is entirely neutral in its general application.[3] Because I agree with that holding, I concur in the judgment.

---

[2] In my opinion, the principal reason for adopting a strong presumption against such claims is not a matter of administrative convenience. It is the overriding interest in keeping the government—whether it be the legislature or the courts—out of the business of evaluating the relative merits of differing religious claims. The risk that governmental approval of some and disapproval of others will be perceived as favoring one religion over another is an important risk the Establishment Clause was designed to preclude.

[3] Today's holding is limited to a claim to a tax exemption. I believe, however, that a standard that places an almost insurmountable burden on any individual who objects to a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes) better explains most of this Court's holdings than does the standard articulated by the Court today. See, e. g., Gillette v. United States, 401 U. S. 437 (selective service laws); Braunfeld v. Brown, 366 U. S. 599 (Sunday closing laws); Prince v. Massachusetts, 321 U. S. 158 (child labor laws); Jacobson v. Massachusetts, 197 U. S. 11 (compulsory vaccination laws); Reynolds v. United States, 98 U. S. 145 (polygamy law). The principal exception is Wisconsin v. Yoder, 406 U. S. 205, in which the Court granted the Amish an exemption from Wisconsin's compulsory school-attendance law by actually applying the subjective balancing approach it purports to apply today. The Court's attempt to distinguish Yoder is unconvincing because precisely the same religious interest is implicated in both cases, and Wisconsin's interest in requiring its children to attend school until they reach the age of 16 is surely not inferior to the federal interest in collecting these social security taxes.

There is also tension between this standard and the reasoning in Thomas v. Review Bd. of Indiana Employment Security Div., 450 U. S. 707, and

*Sherbert* v. *Verner*, 374 U. S. 398. Arguably, however, laws intended to provide a benefit to a limited class of otherwise disadvantaged persons should be judged by a different standard than that appropriate for the enforcement of neutral laws of general applicability. Cf. *Harris* v. *McRae*, 448 U. S. 297, 349–357 (STEVENS, J., dissenting). A tax exemption entails no cost to the claimant; if tax exemptions were dispensed on religious grounds, every citizen would have an economic motivation to join the favored sects. No comparable economic motivation could explain the conduct of the employees in *Sherbert* and *Thomas*. In both of those cases changes in work requirements dictated by the employer forced the employees to surrender jobs that they would have preferred to retain rather than accept unemployment compensation. In each case the treatment of the religious objection to the new job requirements as though it were tantamount to a physical impairment that made it impossible for the employee to continue to work under changed circumstances could be viewed as a protection against unequal treatment rather than a grant of favored treatment for the members of the religious sect. In all events, the decision in *Thomas* was clearly compelled by *Sherbert*.