**JACOBO MARTI & SONS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 81–1971.

United States Court of Appeals, Third Circuit.

Argued March 1, 1982.

Decided April 26, 1982.

John E. Lyncheski (argued), James P. Hollihan, Manion, Alder & Cohen, Pittsburgh, Pa., for petitioner.

Victoria Higman (argued), W. Christian Schumann, Susan Tepper Papadopoulos, William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for respondent.

Before HUNTER, WEIS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

In this appeal an employer attacks the jurisdiction of the National Labor Relations Board on First Amendment grounds. The employer processes cheese from milk supplied by a cooperative controlled by Amish farmers who oppose unions as a matter of religious belief. Alleging that if the Board exercises jurisdiction, the Amish will lose their market for milk and the cheese plant will lose its sole supplier, the employer argues that it should be exempt from Board regulation. We do not find adequate factual support for the employer's assertions and grant enforcement of a Board cease and desist order.

A former employee filed an unfair labor practice charge with the Board, alleging that he was unlawfully discharged from his job because of union organizing activities. The Board concluded that the discharge had been for unrelated causes but, finding improper promises of benefits and a threat of plant closure, issued a cease and desist order. The Board also rejected a jurisdictional challenge that because of the close relationship between the employer and its suppliers, unionization of the plant would impinge on the Amish religious tenets.

At the hearing before the ALJ there was testimony that the religious beliefs of the Old Order Amish sect proscribe the use of electricity. When Pennsylvania enacted regulations in 1955 requiring refrigeration of milk, a process which utilizes electrical equipment, the Amish dairy farmers were unable to comply without violating their religion. They then organized the Farmers' Cheese Cooperative Association, to which they delivered their milk for eventual marketing as cheese products. The Association arranged to have Jacobo Marti, a non-Amish, convert the milk to cheese. Marti is

paid a percentage of the proceeds from cheese sales.[1]

The Association supplies all of the milk Marti uses for cheese and retains title to the milk and cheese until it is sold. Marti hires and fires its employees, fixes wages and working conditions, and is fully responsible for all the operating costs and expenses of the cheese processing operation.

The plant employs eighty-nine persons, twenty of whom are Amish and members of the Association. They receive the same wages as the other employees, but because of their religious beliefs, do not participate in the employer's profit-sharing plan or hospitalization benefits. The Amish employees are also not permitted to join a union.

The parties stipulated that "[d]uring an organizational campaign in 1973, the Association informed [Marti] that, because of the tenets of the Amish religion, it would terminate its agreement with [Marti] should [its] employees organize, form or join a labor organization." Jacobo Marti, plant president, testified that he did not think that he would have to shut down if a union came in, but that his business would be disrupted because he would lose his Amish suppliers and employees. He also said that the Amish dairy farmers in the area would have difficulty in finding another processor because there was "nobody around who could handle it." He was uncertain whether the Amish might arrange some accommodation to supply him with milk in the event that his employees became unionized.

The charges which triggered the hearing grew out of the discharge of Walter W. Holler, a non-Amish employee. In June of 1979, after a year at the plant, Holler began to discuss the idea of unionization with fellow employees. When the personnel manager heard about these overtures, he invited Holler into a private office for a conversation about the situation. The manager explained the advantages and disadvantages of a union and pointed out that the plant couldn't function without the Amish and it would close if a union came in. In addition, he talked about forming a representative committee of employees and also indicated that if production were increased, wages could be raised. The ALJ found these remarks constituted a violation of § 8(a)(1) and (3) of the National Labor Relations Act.

It was also determined that Holler's discharge three months later was the result of his disruptive conduct, not his union activity, and therefore, no violation occurred at that time. The ALJ accordingly recommended that a cease and desist order be issued to prevent the employer from making threats of plant closure or promising better working conditions if the employees refrained from joining a labor organization.

The ALJ rejected the jurisdictional challenge, finding that the employer was a separate and distinct organization from the Association and that Marti had sufficient control over employment conditions so as to enable it to bargain with the union. He also found that the Association was a business corporation, was not church-sanctioned or "church operated," and so did not qualify for a religious exemption. The Board adopted the ALJ's findings and conclusions.

In its petition for review, Marti denies that the Board has jurisdiction "because of the symbiotic relationship which exists between the employer and the Old Order Amish farmers who comprise the Farmers' Cheese Cooperative Association." (Petitioner's Brief). In addition, the employer challenges the findings of the violations themselves. The Board has applied for enforcement of its order.

Marti's argument is that because of their religion, the Amish would be prohibited from dealing with its cheese processing plant if it should become unionized. The lack of other facilities in the area would totally deprive the Amish of a market, and termination of the arrangement would be almost as disastrous for Marti. Further-

---

1. Marti was hired to manage the cheese processing plant in the mid-1950's. He later purchased the land and building from the Association and eventually incorporated. That company took over the contract with the Association.

more, the employer asserts that Marti merely serves as the "alter ego of the Association," and therefore, has "standing to assert the First Amendment rights of the Association and its Amish members." (Petitioner's Brief).[2]

As stated, Marti presents troublesome questions of freedom of religion—a right the courts jealously guard from governmental interference. *See NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979); *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Marti's arguments merit serious consideration and evaluation, but the record does not provide the adequate factual basis necessary to support the employer's contentions.

The record demonstrates that the Association is not a religious or religiously-affiliated organization, except to the extent that the majority of its members adhere to the Old Order Amish faith. Rather, the Association is a business corporation organized under the laws of Pennsylvania. According to its by-laws "[a]ny person, firm, partnership, corporation, or association," who produces agricultural products is eligible for membership by the purchase of a single share of stock. Some of the members are not Amish, although the officers and members of the Board practice that faith. Nothing in the by-laws refers to a religious purpose or in any way distinguishes this association from other agricultural cooperative organizations.

It was stipulated that because of the religious views of the majority of its members, six years before this controversy arose the Association told Marti that it would terminate its agreement if Marti's employees joined a labor organization. Whether the Association is still of that view is a crucial fact that is not in the record. Jacobo Marti testified at one point that he had no doubt that the Association would terminate the contract if a labor organization represented his employees. Yet he also admitted that he did not know whether the Association would still supply him with their milk in that event. Thus, the record does not establish whether the Amish prohibition against joining a union extends to ban dealings with an organized company as well.

The current agreement between the Association and Marti provides that title to the milk and the cheese derived from it remains in the Association. If Marti's unionization made this arrangement unsatisfactory to the Amish, perhaps the transaction could take a different form. For example, it might be that the Association would be free to sell its milk to Marti at a comparable price to that which it now receives for it as cheese, with appropriate adjustments so that Marti, too, would realize as much as he presently does under the existing arrangement.

There is no evidence before us to suggest that an alternative arrangement would not avoid the asserted religious objections.[3] The record as it now stands neither demonstrates that the Amish will be completely deprived of a milk market nor that Marti will lose its supply. Without proof of underlying facts, the dire results which have been argued to us must be considered only speculation.

Analysis reveals a similar weakness in the assertion that the Amish could no longer be

---

**2.** The Board has not questioned Marti's standing to raise the First Amendment issue and we assume it here *arguendo*.

**3.** Delving into the contours of religious belief is a sensitive area, and "[c]ourts are not arbiters of scriptural interpretation." *Thomas v. Review Board*, 450 U.S. 707, 716, 101 S.Ct. 1425, 1431, 67 L.Ed.2d 624 (1981). As a preliminary matter, "[t]he narrow function of a reviewing court in this context is to determine whether there was an appropriate finding that [the Association will terminate its contract if Marti unionizes] because of an honest conviction that such [association] was forbidden by [the Amish] religion." *Id.* It is this finding, however, that is not established by the record. Without questioning the sincerity of the Amish beliefs, it is unclear why a sales arrangement would offend the religious tenets of the Amish if Marti were to unionize when it was stipulated that "Jacobo Marti was hired to manage the plant and to do certain other acts prohibited by the Amish faith which the Association could not itself undertake."

employed if a union came into the plant. Although their religion prohibits the Amish from belonging to a union, there is nothing here to show that they may not work side-by-side with employees who do join. Accommodation here, too, may be possible. The Labor Relations Act contains a provision that, in non-profit hospitals, a worker with religious objections to joining a union may instead contribute the monetary equivalent of union dues to a charity. 29 U.S.C. § 169 (1976). *See also Nottelson v. Smith Steel Workers*, 643 F.2d 445 (7th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 587, 70 L.Ed.2d 488 (1981). Indeed, in Marti's case it appears that the Amish employees, because of their unwillingness to accept fringe benefits, are already receiving lower total compensation than the other employees. Perhaps this portion could be given to a charitable organization, if necessary, without violating the employees' beliefs.

It is important to remember also that the other employees' interests are at stake. As the Supreme Court said in *United States v. Lee*, —— U.S. ——, ——, 102 S.Ct. 1051, 1057, 71 L.Ed.2d 127 (1982), "When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity."

It may be that there is indeed support for Marti's argument about repressive effects on Amish religious practices, but it is not presented by the record in this case.[4] Hence, lacking evidentiary support, the employer's claim on behalf of the Amish cannot prevail. We have appraised Marti's case in the light most favorable to it, yet find it inadequate. Marti has not met its burden of proving that it comes within an exception to the Board's jurisdiction.

4. We have been advised that a representation petition is presently pending before the Board. Our conclusions as to the lack of factual support in the present record, of course, do not prevent the employer from developing additional information in the representation proceeding.

It must be noted that the Board lacks jurisdiction to pass on constitutional questions, such as the one raised here. *Califano v. Sand-*

*NLRB v. Monterey County Building & Construction Trades Council*, 335 F.2d 927, 930 n.4 (9th Cir.), *cert. denied*, 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1964). The employer here has failed to show that the governmental obligation to be imposed "interferes with the Free Exercise rights of the Amish." *United States v. Lee*, —— U.S. at ——, 102 S.Ct. at 1055.

Moreover, the Board's decision may be sustained on an alternative ground—that Marti is, in fact, an independent organization that controls its own employee relationships. *See, e.g., Memorial Hospital v. NLRB*, 624 F.2d 177, 185 (10th Cir. 1980); *NLRB v. Howard Johnson Co.*, 317 F.2d 1 (3d Cir.), *cert. denied*, 375 U.S. 920, 84 S.Ct. 264, 11 L.Ed.2d 164 (1963). Although there is a possibility that the Association could terminate its contract because of Marti's labor policies, that eventuality exists for any number of other reasons as well, since either party has a right of termination on 90 days notice. As Marti testified, severing the relationship would result in disruption of business, but would not result in closing the plant.

The Association did not reserve the right to control Marti's activities but, to the contrary, the agreement specifies that Marti is to "pay for all labor used in the operation of the factory." Thus, Marti's operation is no more symbiotic with the Association than is any other commercial enterprise which depends upon a single supplier by virtue of a contract that may be cancelled on notice for any or no reason. Indeed, the stipulated facts state that the "Farmer's Cheese Cooperative Association is a separate and distinct enterprise from [Marti]." The record before us contains nothing to cast any doubt on that proposition.

*ers*, 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977). As we said in *Tressler Lutheran Home for Children v. NLRB*, 677 F.2d 302 (3d Cir., 1982), resolution of such issues is left to the courts. The Board, however, must be especially sensitive when confronted with First Amendment free exercise objections.

Marti's cheese processing plant is not a religious organization, but a purely business one having only commercial aims. Its arrangement with the Association is one for the marketing of milk products, not of religious beliefs. Marti argues that it is paramount to the survival of the Amish community that the revenue obtained from the Association be used to maintain their group. The fact that the money from the sale of cheese is used for the physical sustenance of the Old Order Amish families, however, does not convert the factory into a religious enterprise—any more than if the proceeds went to the families of other diverse religious groups. The fact that the Amish farmer may choose to use his money to support himself in the manner his religion requires does not convert his profit-making pursuits into what the law conceives to be religious activity. The individual Amish farmer is seeking to support himself, just as do farmers of other creeds or those who have no religious beliefs.

We find no need to discuss the unfair labor practice charges at any length. There is substantial evidence to support the ALJ's conclusion that the employer violated § 8(a)(1) and (3). The manager overstated the case when he told Holler that the plant would close if a union came in. As we mentioned earlier, Jacobo Marti's own testimony does not support the manager's position. The manager's comment was not a statement of fact, and we therefore cannot say that the ALJ erred in construing it as a threat. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969). Similarly, the promises of better conditions were advanced to dissuade Holler from pursuit of his union activities.

We conclude, therefore, that the Board had jurisdiction and that it properly issued a cease and desist order. Therefore, it will be enforced.