# Constitutionality of the Social Security Act Amendments of 1983

An amendment to the Social Security Act repealing the exemption for nonprofit organizations, including religious organizations, thereby requiring such organizations to pay and withhold tax with respect to the Social Security Fund, does not violate the First Amendment's Free Exercise or Establishment Clauses.

Assuming the tax payment and withholding requirement conflicts with the free exercise of religion in some cases, the government nevertheless has an overriding interest in securing the financial solvency of the fund and making sure that its coverage is comprehensive.

The repeal of the exemption does not violate the Establishment Clause because it has a clear secular purpose, does not inhibit or advance religion because it is neutral in its general application, and does not excessively entangle the government with religion. Social Security taxes are like other business and income taxes to which religious organizations are already subject.

February 14, 1984

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL,
OFFICE OF LEGISLATIVE AFFAIRS

This responds to the request for our opinion whether § 102 of the Social Security Amendments of 1983 (Act), Pub. L. No. 98– 21, 97 Stat. 65 (1983), violates the First Amendment. We do not believe that § 102 violates either the Free Exercise Clause or the Establishment Clause of the First Amendment.

## I. Background

The Act was passed in 1983 primarily in an effort to address certain financial problems facing the social security system. Section 102 of the Act, 97 Stat. 70, repealed the existing exemption applicable to employees of non-profit organizations, 42 U.S.C. § 410(a)(8)(B) and 26 U.S.C. § 3121(b)(8)(B), including "religious" organizations such as churches.[1] As a result, payment of social

---

[1] Prior to the repeal, 42 U.S.C. § 410(a)(8)(B) and 26 U.S.C. § 3121(b)(8)(B) exempted service for tax-exempt organizations described in 26 U.S.C. § 501(c)(3) from the definition of employment. However, the law permitted such non- profit organizations to waive their immunity voluntarily so that they could participate in the system if they wished. An estimated 80 percent of the non-profit organizations to which the exemption applied had determined to participate in the system at the time the Act was being considered. H.R. Rep. No. 25, Part I, 98th Cong., 1st Sess. 15 (1983). Once an organization joined the system, it had to remain

Continued

23

security taxes by these institutions for most of their employees is now mandatory rather than voluntary. Congress made this change because it was "deeply concerned" that more and more non-profit organizations were terminating their voluntary inclusion in the system, thereby threatening the retirement benefits of their employees. H.R. Rep. No. 25, Part I, 98th Cong., 1st Sess. 16–17 (1983). A larger concern, applicable generally to the coverage and financing provisions of the Act, was the restoration of the financial soundness of the Old Age and Survivor Insurance Program. *Id.* at 3, 13. The mandatory inclusion of the non-profit organizations, for example, is expected to raise $2.3 billion dollars over the next two years, about half of which will come from religious organizations. Written Statement of John E. Chapoton, Assistant Secretary for Tax Policy, Department of the Treasury, Before the Senate Finance Committee (Dec. 14, 1983).

There was very little debate over § 102, beyond its inclusion in summaries of the Act's provisions. *See, e.g.,* 129 Cong. Rec. 4496 (1983) (statement of Rep. Rostenkowski); *id.* at 5470 (statement of Sen. Dole).[2] The House Report, however, did note that Congress had made coverage voluntary when it extended the system to non-profit organizations in 1950 because of concerns by religious groups over "Federal influence over religious activities" and "separation of church and State." H.R. Rep. No. 25, Part I, supra, at 16. These concerns had been addressed by at least one of the commissions examining reform of the system. *Report of the Universal Social Security Coverage Study Group on the Desirability and Feasibility of Social Security Coverage for Employees of Federal, State, and Local Governments and Private, Nonprofit Organizations* 258–59 (1980).[3] Because the House Report noted that these concerns had been raised when optional coverage was extended to these groups in 1950 and then went on to explain the policy reasons for including the non-profit organization employees in the Act, we must assume that Congress was aware of the First Amendment considerations and issues which would be raised, but determined that the proposal was not unconstitutional.

---

[1] (. . . continued)
in it for a minimum of ten years before it could terminate coverage for its employees. *Id.* The Act did not repeal the exemption available for ministers or members of religious orders. 42 U.S.C. § 410(a)(8); 26 U.S.C. § 3121(b)(8). These classes of persons may file for an exemption from coverage for their self employment earnings, a choice they must generally make within two years of ordination. Only individuals who are neither ministers nor members of religious orders are covered by the change in the Act.

[2] There was a short debate on what the effective date of § 102 should be. *See* 129 Cong. Rec. 6914–16 (1983).

[3] This Report, in turn, relied in part on an opinion from Professor Norman Dorsen of New York University Law School. *Id.* at 261–65. Both the Report and Professor Dorsen concluded that an Establishment Clause attack would probably fail. However, Professor Dorsen did not believe that protecting the financial security of the system was a sufficiently compelling state interest to overcome the Free Exercise interests of those who had conscientious religious objections to paying into the system, *id.* at 265, and therefore felt that an exemption for those holding contrary religious beliefs had to be included to prevent a violation of the Free Exercise Clause. However, the Supreme Court has subsequently made it clear that Professor Dorsen's evaluation of the weight that would be accorded the government's interest in a strong social security system was incorrect. *See United States v. Lee,* 455 U.S. 252 (1982) (discussed below).

24

> Whenever called upon to judge the constitutionality of an Act of Congress — "the gravest and most delicate duty that this Court is called upon to perform," *Blodgett* v. *Holden,* 275 U.S. 142, 148 (1927) (Holmes, J.) — the Court accords "great weight to the decisions of Congress." *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U.S. 94, 102 (1973). The Congress is a coequal branch of government whose Members take the same oath we do to uphold the Constitution of the United States. As Justice Frankfurter noted in *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U.S. 123, 164 (1951) (concurring opinion), we must have "due regard to the fact that this Court is not exercising a primary judgment but is sitting in judgment upon those who also have taken the oath to observe the Constitution and who have the responsibility for carrying on government." The customary deference accorded the judgments of Congress is certainly appropriate when, as here, Congress specifically considered the question of the Act's constitutionality.

*Rostker* v. *Goldberg,* 453 U.S. 57, 64 (1981).

The constitutionality of § 102 has been raised in the discussion of S. 2099, a bill to postpone the effective date of § 102 for two years, that was introduced by Senator Jepsen and is now under consideration by the Senate Finance Committee. We discuss below the two possible First Amendment grounds of attack on § 102. We agree with Congress' sub silentio conclusion that § 102 is constitutional.

## II. Free Exercise Clause

The Constitution provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I, § 1. Section 102 has been attacked, *see* 129 Cong. Rec. 32611–12 (1983), on the grounds that mandating contributions by individuals and organizations whose sincere religious beliefs prohibit participation in the social security system violates the free exercise of their religious beliefs. The Supreme Court has recently articulated the analytical framework for this question in *United States* v. *Lee,* 455 U.S. 252 (1982). The Lee opinion makes clear that the government's interest in assuring mandatory and continuous participation in and contribution to the social security system is extraordinarily high. In *Lee,* an Amish farmer refused to withhold social security taxes from his Amish employees or to pay the employer's share of such taxes because he believed that payment of the taxes and receipt of the benefits would violate the Amish faith.[4] *Id.* at 254–55. He claimed, and the Court accepted his argument, that imposition of social security taxes violated his First Amendment free exercise rights and those of his Amish employees. *Id.* at 255, 257.

---

[4] "The Amish believe that there is a religiously based obligation to provide for their fellow members the kind of assistance contemplated by the social security system .... We therefore accept appellee's contention that both payment and receipt of social security benefits is forbidden by the Amish faith." *Id.* at 257.

25

The conclusion that there is a conflict between the Amish faith and the obligations imposed by the social security system is only the beginning, however, and not the end of the inquiry. Not all burdens on religion are unconstitutional. *See, e.g., Prince* v. *Massachusetts,* 321 U.S. 158 (1944); *Reynolds* v. *United States,* 98 U.S. 145 (1879). The state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest.

*Id.* at 257–58. The Court then identified the government's compelling interest assuring "mandatory and continuous participation in and contribution to the social security system:"

The social security system in the United States serves the public interest by providing a comprehensive insurance system with a variety of benefits available to all participants, with costs shared by employers and employees. . . . The design of the system requires support by mandatory contributions from covered employers and employees. This mandatory participation is indispensable to the fiscal vitality of the social security system. . . . Moreover, a comprehensive national social security system providing for voluntary participation would be almost a contradiction in terms and difficult, if not impossible, to administer.

*Id.* at 258–59 (footnotes omitted). A remaining inquiry in the *Lee* case was whether accommodating the Amish belief would unduly interfere with fulfillment of the governmental interest. The Court focused on the fact that the social security contributions are a tax and that in the area of taxation, religious practices must yield to the government's interest in maintaining an organized society.

The tax system could not function if denominations were allowed to challenge the tax system because tax payments were spent in a manner that violates their religious belief. *See, e.g., Lull* v. *Commissioner,* 602 F.2d 1166 (CA4 1979), *cert. denied,* 444 U.S. 1014 (1980); *Autenrieth* v. *Cullen,* 418 F.2d 586 (CA9 1969), cert. denied, 397 U.S. 1036 (1970). Because the broad public interest in maintaining a sound tax system is of such a high order, religious belief in conflict with the payment of taxes affords no basis for resisting the tax.

*Id.* at 260.[5] The *Lee* decision was decided by the Supreme Court in a unanimous judgment.[6] The Court held that compelling an individual to participate in the

---

[5] Thus, cases involving application of taxes are distinguishable from those involving less compelling government interests such as education, *see Wisconsin* v. *Yoder,* 406 U.S. 205 (1972), or labor management relations, *Catholic Bishop* v. *NLRB,* 559 F.2d 1112 (7th Cir. 1977), *aff'd on statutory grounds,* 440 U.S. 506 (1979). *See Parker* v. *Commissioner,* 365 F.2d 792, 795 (8th Cir. 1966), *cert. denied,* 385 U.S. 1026 (1967). *See also Jaggard* v. *Commissioner,* 582 F.2d 1189 (8th Cir. 1978), *cert. denied,* 440 U.S. 913 (1979); *Graves*

Continued

26

social security system is not an impermissible interference with that individual's constitutional right to the free exercise of his religion.[7]

Turning to § 102, we assume, as the Court did in *Lee*, that there are religious organizations whose tenets would be offended by payments on behalf of employees into the social security system. Because this is "only the beginning, however, and not the end of the inquiry," *id.* at 257, the next issue is whether there is a compelling governmental interest that will overcome the imposition on the religious liberty of those individuals who would have conscientious objections to mandatory coverage by the system. We have little difficulty in concluding that the courts will find that the same interest at stake in *Lee* was implicated in passage of § 102. Congress, in discussing § 102, emphasized both its concern that employees of non-profit organizations not "forfeit the advantages of a nearly universal social insurance system," H.R. Rep. No. 25, *supra*, at 16, and the need to protect the solvency of the system by spreading the coverage as broadly as possible to gain extra revenue. S. Rep. No. 23, 98th Cong., 1st Sess. 12 (chart detailing revenue gain).[8] If the stability of the social security system and the administrative advantages of universal coverage were sufficient in 1982 to overcome free exercise rights as the Court determined in the *Lee* case, we believe that those interests have, if anything, become stronger given the broadly based and bipartisan consensus in 1983 that without the Act the financial soundness of the entire system was in jeopardy.

Finally, we believe that a court would conclude, as in *Lee*, that accommodation of those individuals and organizations with religious objections, while mandating coverage of others, including religious organizations, with no religious objection to the social security system, would unduly interfere with fulfillment of the governmental interest. The Supreme Court recognized that Congress grants exemptions to various taxing schemes, including the social security system. In fact, in *Lee* the Court noted that Congress had provided an exemption from the system for self employed Amish because of their religious objections. 26 U.S.C. § 1402(g). The Court stated that this was a reasonable accommodation,[9] but did not draw from this conclusion any rule that Congress

[5] ( . . . continued)

v. *Commissioner*, 579 F.2d 392 (6th Cir. 1978), *cert. denied*, 440 U.S. 946 (1979); *Winters* v. *Commissioner*, 468 F.2d 778, 781 (2d Cir. 1972), *Basic Unit Ministry* v. *United States*, 511 F. Supp. 166, 169 (D.D.C. 1981), *aff'd*, 670 F.2d 1210 (D.C. Cir. 1982); *Varga* v. *United States*, 467 F. Supp. 1113, 1118 (D. Md. 1979), *aff'd mem.*, 618 F.2d 106 (4th Cir. 1980). *Cf. Ward* v. *Commissioner*, 608 F.2d 599 (5th Cir. 1979), *cert. denied*, 446 U.S. 918 (1980).

[6] Justice Stevens wrote a separate opinion concurring in the judgment. *Id.* at 261.

[7] *See also Olsen* v. *Commissioner*, 709 F.2d 278 (4th Cir. 1983) (self employment tax); *Victory Baptist Temple, Inc.* v. *Industrial Comm'n*, 422 N.E.2d 819, 2 Ohio App. 3d 418 (Ct. App.) (workmen's compensation), *cert. denied*, 459 U.S. 1086 (1982).

[8] Moreover, § 102 is located in Title I of the Act which is entitled "Provisions Affecting the Financing of the Social Security System." 97 Stat. 65. Congress' overriding interest in expanding coverage, such as by including employees of nonprofit groups and new federal employees and by preventing terminations by State and local governments, to new sources of revenue in order to shore up the system is evident in all three reports. H.R. Rep. No. 47, 98th Cong., 1st Sess. 118–19 (1983); S. Rep. No. 23, 98th Cong., 1st Sess. 1, 12 (1983); H.R. Rep. No. 25, Part I, 98th Cong., 1st Sess. 3, 13 (1983).

[9] "Confining the § 1402(g) exemption to the self employed provided for a narrow category which was readily identifiable." *United States* v. *Lee*, 455 U.S. at 261.

27

was compelled to extend the exemption to all other Amish. Rather, the Court concluded the opinion by saying:

> Congress and the courts have been sensitive to the needs flowing from the Free Exercise Clause, but every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs. Granting an exemption from social security taxes to an employer operates to impose the employer's religious faith on the employees . . . . The tax imposed on employers to support the social security system must be uniformly applicable to all, except as Congress provides explicitly otherwise.

455 U.S. at 261. Because of the government's overwhelming interest in a social security system which is as uniform as possible, the Free Exercise Clause does not prohibit the non-discriminatory application of a standard tax to a religious organization or its employees. We therefore believe that the elimination by § 102 of the exemption for non-profit organizations, including religious ones, is permissible even if it does offend the religious convictions of some who will be required to participate.

### III. Establishment Clause

The Constitution also provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I, § 1. Section 102 has been attacked on the grounds that compelling the participation of churches will inevitably entangle the government in the affairs of the churches, thereby violating the Establishment Clause.

Whether a statute violates the Establishment Clause is frequently analyzed under the three-part test articulated in *Lemon* v. *Kurtzman*, 403 U.S. 602, 612–13 (1971). First, the challenged statute must have a secular purpose. Section 102 has at least two *bona fide* secular purposes: providing income security for workers and their families by insuring that they are protected by the social security system and providing money to the underfunded system's trust funds. Second, the primary effect of the challenged statute must be one that neither advances nor inhibits a particular religion. The Social Security tax's primary purpose raising revenue does not inhibit religion. *Cf. United States* v. *Lee*, 455 U.S. 252, 263 (1982) (Stevens, J., concurring) (concluding that "there is virtually no room for a 'constitutionally required exemption' on religious grounds from a valid tax law that is entirely neutral in its general application").

Third, the statute must not foster excessive government entanglement with religion. Excessive entanglement involves some of the principal evils at which the Establishment Clause was aimed: government sponsorship, financial support or active involvement by the sovereign in a religion. *Lemon* v. *Kurtzman*, 403 U.S. at 612. For example, in *Lemon* the Supreme Court struck down a statute providing reimbursement to parochial schools for the salaries of teach-

28

ers who taught non religious subjects. The Court held that the very effort by the state to ensure that the money was properly spent would require a degree of oversight and surveillance that would entangle the government. *Id.* at 619–20. The churches would no longer be the exclusive judges of the teachers' conduct. Thus, courts must examine whether enforcement of the law will impinge on the church's substantive decisionmaking power or intrude on questions of church doctrine.

We do not believe that the mere transmission to the government of money for social security taxes will involve excessive entanglement of the churches and the federal government.[10] Churches must presently pay some federal taxes, such as excise taxes on telephones and income taxes on unrelated business income. Moreover, they already are obligated to withhold income taxes from their employees. *See Eighth Street Baptist Church, Inc.* v. *United States*, 295 F. Supp. 1400 (D. Kan. 1969), *aff'd*, 431 F.2d 1193 (10th Cir. 1970) (per curiam). We are not aware of any case successfully challenging this essentially administrative duty as excessively entangling for the churches. The Act will not force the churches to share their decisionmaking power: they are free to allocate their resources as they see fit after they pay their taxes. Because it is permissible for Congress to impose non-discriminatory and uniform taxes on churches on the same basis as other entities and since churches already are required to withhold income taxes for their lay employees, we do not believe that requiring churches to pay the employer's portion of applicable social security taxes or to withhold the employee's portion violates the Establishment Clause.[11]

## Conclusion

Section 102 of the Act violates neither the Free Exercise Clause nor the Establishment Clause of the First Amendment. We will be glad to discuss this matter with you if you have any further questions.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[10] *Walz* v. *Tax Comm'n*, 397 U.S. 664 (1970), is not to the contrary. In *Walz*, the Court upheld a state's tax exemption for church property against an Establishment Clause challenge. The Court pointed out that removing the tax exemption might lead to more church entanglement with the government since liens, foreclosures and lawsuits would arise if the property were taxed. 397 U.S. at 674. Although some commentators have argued that this means that exemptions are constitutionally required, *see* Note, *Tax Exemptions, Subsidies and Religious Freedom After Walz* v. *Tax Commission*, 45 N.Y.U. L. Rev. 876 (1970), the Supreme Court's summary distinguishing of the exemption for self-employed Amish in *United States* v. *Lee*, 455 U.S. 252, 261 (1982), lends little credence to this argument. Rather, *Walz* should be read for the proposition that tax exemptions themselves are not unconstitutional.

[11] It is also instructive that over the years a large number of churches have opted into the system voluntarily, *see supra* note 1, without any evidence of impermissible entanglement.