**GAY RIGHTS COALITION OF GEORGETOWN UNIVERSITY, et al., Appellants,**

**District of Columbia, Intervenor-Appellant,**

v.

**GEORGETOWN UNIVERSITY, et al., Appellees.**

Nos. 84–50, 84–51.

District of Columbia Court of Appeals.

Argued Oct. 24, 1984.

Decided July 30, 1985.

Richard A. Gross, Washington, D.C., with whom John F. Daly, Laura A. Foggan, Ronald E. Bogard, Washington, D.C., and Carol J. Jennings were on brief, for appellants.

Charles H. Wilson, Washington, D.C., with whom Vincent J. Fuller, Nancy F. Preiss, and James C. Gregg, Washington, D.C., were on brief, for appellees.

Inez Smith Reid, Corp. Counsel, John H. Suda, Principal Deputy Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Corp. Counsel, Washington, D.C., were on brief, for intervenor-appellant.

Before FERREN, MACK and TERRY, JJ.

FERREN, Associate Judge:

Granting partial summary judgment, the trial court ruled that Georgetown University's refusal to "recognize" two gay rights groups as "official" student organizations violated the District of Columbia Human Rights Act's prohibition against discrimination by an educational institution based upon "sexual orientation."[1] After a trial on the University's constitutional defense, however, the court, sitting without a jury, ruled for Georgetown, holding that the University's right not to recognize these groups was protected by the free exercise clause of the First Amendment. Georgetown has not challenged on appeal the trial court's ruling that the University's actions unlawfully discriminated on the basis of sexual orientation. Nor does either side contend that "recognition" of an "official" student organization obligates the University to provide a financial subsidy; for our purposes here, "recognition" is an intangible. The only issue on appeal, therefore, is whether Georgetown's unwillingness to "recognize" the gay rights groups—as that concept is to be understood—must be excused on the ground that the Human Rights Act, as applied, impermissibly interferes with the University's constitutional right to the free exercise of religion. We

hold that the Constitution does not afford Georgetown its claimed protection.[2] We therefore must reverse judgment for the University and order the trial court to enter judgment for appellants.[3]

## I.

In 1979, two student organizations—the Gay People of Georgetown University (GPGU) on the main campus and the Gay Rights Coalition (GRC) at the Georgetown University Law Center—applied for "University recognition." The University turned both groups down, claiming that such recognition would imply endorsement of the groups' goals and activities and that, in light of the Church's teachings on homosexuality, such "endorsement would be inappropriate for a Catholic University." .

More specifically, GPGU sought recognition as an official student organization on two occasions: in January 1979 and again, during the next term, in November 1979. Each time the Student Activities Commission (SAC) and the Undergraduate Student Senate approved the application, but the controlling University administrator then rejected it. That rejection was sustained at every level of University review, including (on the second occasion) a review by President Healy.[4]

---

1. D.C.Code § 1–2520 (1981) provides in relevant part:

   It is an unlawful discriminatory practice, subject to the exemptions in § 1–2503(b), for an educational institution:

   (1) To deny, restrict, or to abridge or condition the use of, or access to, any of its facilities and services to any person otherwise qualified, wholly or partially, for a discriminatory reason, based upon the race, color, religion, national origin, sex, age, marital status, personal appearance, *sexual orientation*, family responsibilities, political affiliation, source of income or physical handicap of any individual.... [Emphasis added.]

2. Because we conclude that Georgetown's free exercise rights are not sufficiently infringed to bar enforcement of the Human Rights Act, *see supra* note 1, we do not consider appellants' argument that the University may not assert *free exercise* rights because of its legal commitment under subchapter VII of the Higher Education Act of 1965, 20 U.S.C. § 1132a–e (1982);

*see id.* § 1132e (c), to use federally funded facilities only for secular purposes.

3. Plaintiff-appellants are two gay rights groups, Gay People of Georgetown and Gay Rights Coalition of Georgetown University Law Center, as well as individual student members of these groups. (The trial court dismissed three faculty member-plaintiffs for lack of standing.) Defendant-appellees are Georgetown University, its President, Rev. Timothy S. Healy, S.J., and the Dean of its Law Center, David J. McCarthy, Jr., to whom we refer collectively as "Georgetown" or "the University."

4. A representative of GPGU testified that this was "the first time ever, to our knowledge, the administration stepped in and said it would not accept a decision of the student government." SAC wrote separately to request a reversal or reconsideration of the University's denial of recognition. In this connection, however, we note that, in 1973, University officials denied an application for recognition by a gay rights group

Similarly, in December 1979, GRC sought formal recognition by applying to the Law Center's Committee on Student and Faculty Life. The Committee unanimously approved the application, and a substantial majority of the law faculty voted to endorse that decision. However, the Dean of the Law Center, whose concurrence was necessary for final approval of a student organization, interposed a veto.

## A.

There was considerable confusion at trial as to what "University recognition" means. GPGU's first application was governed by the criteria set forth in a document entitled "What Your Club Needs to Know" (WYCNTK), which was in force during the 1978–79 school year.[5] WYCNTK directed student organizations to apply through SAC for recognition, using a two-step process. As to the first, if an organization met each of several "guidelines" or neutral criteria—such as having a minimum of 12 members, being open for membership to the entire University community, submitting a written constitution, and serving "some educational, social, or cultural purpose"—the group would be entitled to a Student Government Charter which granted "official recognition as a legitimate activity of the student body." This charter, moreover, would entitle an organization to use University facilities, to list events on the monthly student activities calendar, to apply for lecture fund privileges, and to receive financial counseling from the SAC Comptroller.

After obtaining a Student Government Charter, a group could attempt to meet WYCNTK's "second group of criteria" by applying, initially through SAC, for "University recognition and funding." These criteria were not very specific. WYCNTK noted that, "[i]n general, a group must adhere to the University's educational mission" and that "[c]ertain groups, whose scope and purpose may be of an immediate, special interest, will not be funded" since their "activities may not truly reflect the sentiments of the student body whose tuition payments would fund these activities."[6] WYCNTK accordingly stressed funding priorities for "educational, service, artistic or culturally oriented" groups, as well as for athletic and campus ministry groups. It limited funding of political groups to those which "serve an educational as opposed to a specifically political purpose."

If a group qualified for "University recognition and funding," it could seek funds for overhead and activities in addition to the facilities support inherent in a Student Government Charter; for example, it could apply for office space and propose a budget for travel expenses, equipment, office supplies, and a telephone.

Although WYCNTK did not specifically say so, it is apparent from that document, and even more clearly from the trial record, that, given SAC's and the Universi-

---

under the criteria of the Student Life Handbook for 1972–73.

**5.** There was genuine dispute as to what criteria were applied to each application. Georgetown claims that GPGU's applications were governed by the specific criteria set forth in a document called "Recognition Criteria: Student Clubs & Organizations," which equates "recognition" with University "endorsement" of the group's "various co-curricular activities." Appellants reply that the University applied this document (which was drafted in the fall of 1979) only to GPGU's second application for recognition, if at all; that the University never applied it to GRC's application; and, in any event, that this document was "pretextual," *i.e.,* a calculated response to GPGU's first application for recognition. Because we find no significant inconsistency between "Recognition Criteria" and the WYCNTK criteria that were in force earlier, we have not paused to consider the University's motives; we have attempted only to clarify which criteria were in force and how they were administered at the relevant times.

**6.** WYCNTK stated that "[t]he guidelines, fiscal and otherwise, which govern the various student organizations are not arbitrary." It then referred to the appended Budgeting and Accounting Act, which contained financial guidelines but no enlightenment as to how an organization might establish that it served the "University's educational mission."

ty's funding priorities and limitations, a group could attain "University recognition" without qualifying for "funding," other than the financial support inherent in receipt of a Student Government Charter. More specifically, a group could achieve "University recognition," as such, by retaining the charter (signifying "official recognition as a legitimate activity of the student body") with the approval, or at least without the disapproval, of the University administration.

But what if the University administration disapproved? Appellants contend that such disapproval was unprecedented, *see supra* note 4, but they do not argue that the administration lacked authority to prevent "official recognition" in a proper case. It follows that, if the University withheld its recognition, such disapproval would leave a SAC-chartered group, in effect, with only "unofficial" student government recognition.

In sum, although WYCNTK announced a two-step process—"official recognition" through a Student Government Charter and "University recognition and funding" —that process presupposed no University veto. Given the University's authority to veto SAC's provisional award of "official recognition," there were, implicitly, three achievable statuses under WYCNTK: student government (unofficial) recognition, University (official) recognition, and funding.

### B.

Pursuant to WYCNTK procedure, SAC voted on January 30, 1979, to grant GPGU a charter—with all the attendant recognition and privileges—and made the following statement:

The SAC has granted a charter to the Gay People of Georgetown for the purpose of providing a forum where all students of Georgetown may come to understand the concerns of Gay Students. The recommendation for a charter does not mean that the SAC is making any statement on the rightness or wrongness of homosexuality or is implying that the University is making such a statement.[7]

The Undergraduate Student Senate approved SAC's vote on February 4. Two days later, however, the Associate Dean of Student Affairs, William C. Schuerman, wrote the President of the Undergraduate Student Government that the University "will not endorse the 'Gay People of Georgetown University' as an 'official' activity of its Student Affairs Programs." More specifically, he said, the University would not grant GPGU funds, provide subsidized office space, telephone service, office supplies, or equipment, and would not authorize use of Georgetown's name. He added, however:

These students may continue to organize, to express opinions, to publicize educationally related events. Gay students may use University facilities for educationally related purposes such as meetings, discussion groups, speakers, etc. The office and services of the Director of Student Activities are available to gay students for help and assistance in planning educationally related programs. All academic personnel and educational support services in the University are open and available to gay students for assistance and advice.

It would appear, therefore, that in early 1979 GPGU achieved, in effect, student government recognition, coupled with University-approved access to facilities consonant with Student Government Charter status, but without "University recognition" as an "official" student activity.

### C.

During the next school term, on or about November 13, 1979, SAC again voted to

---

**7.** SAC's initial statement that it "has granted a charter," followed by its reference to "recommendation for a charter," implies, and thus confirms our conclusion, that SAC's approval of "official recognition" was subject to a condition that the University administration either approve or at least not disapprove.

grant GPGU a charter and later issued a release stating:

> The GPG convinced the SAC, with both their written constitution and their oral presentation, that they represent a distinct group of students on this campus whose existence we as student representatives are bound to acknowledge. Furthermore, by enumeration of their educational functions (e.g. answering questions in nursing classes, "enlightening RAs", etc.), the GPG depicted itself as, to borrow from the criteria, "a positive force within the University community."

Before the Undergraduate Student Senate approved the charter (on or about December 8), Dean Schuerman had written to a GPGU representative on November 21 as follows:

> I am writing in response to the recent action taken by the Student Government in which the Gay People of Georgetown were granted a "Student Government" charter. This charter was granted in accordance with the guidelines set forth in *What You Need To Know* published by the Student Activities Commission.

> Last year in a memo on this subject to the president of S.G., I stated the University's position on the basic rights of all student groups at Georgetown. It is my understanding that these are essentially the same rights articulated by your charter.

> Gay students on this campus have always had the right to organize, express opinions, publicize and advertise educationally related events, and use University facilities for educationally related purposes such as meetings, discussion groups, and speakers. Further, the advice of the office of the Director of Student Activities is available for help and assistance in planning such educationally related activities.

> I must reiterate, however, that the University does not and will not accept the actions of the Student Activity Commission as "official recognition" of the "Gay People of Georgetown University."

> The University does not view this organization as an "official" activity of the University or its Student Affairs Program. The University will not contribute to the support of the organization:
>
> 1. Through a grant of University funds.
> 2. By providing subsidized office space, telephone service, office supplies, equipment, postal service, etc.
> 3. By granting authorized use of the name Georgetown University.

Dean Schuerman accordingly clarified GPGU's status after student government approval of both applications: it had a Student Government Charter, minus "official recognition"; it thus had access to University facilities identical to the access of other chartered organizations, minus an opportunity to apply for additional overhead and activities funding and without official authority to use Georgetown's name.

### D.

Sometime in the fall of 1979, the University published "Recognition Criteria: Student Clubs & Organizations." This document to some extent amended, but primarily clarified, WYCNTK by refining the application criteria. It specified, for the first time, the three distinct levels of support reflecting the realities inherent under WYCNTK and evident from GPGU's applications: "Student Body Endorsement," signifying SAC's "endorsement of the co-curricular activities undertaken by an individual club"; "University Recognition," defined as "endorsement of the various co-curricular activities undertaken by a specific club"; and "University Funding," defined as "recognition in a monetary form."

The first level of support—SAC endorsement—was essentially the same as under WYCNTK, including the financial support inherent in the use of University facilities and student advertising privileges. The second level of support, however, not only expressly provided a new, distinct opportunity for "University recognition," as such, but also accorded each University-recog-

nized group an automatic right to additional privileges: a mailbox in the Student Activities Office, use of the computer label and mailing services, and the opportunity to apply for funding. The third level of support, funding, was now altogether separate and could "be requested only after a group ha[d] proven the stability of its organization to the SAC." Funding, moreover, was "not appropriate for all clubs."

Pertinent here to GPGU and, by analogy, to GRC,[8] are specific criteria prerequisite to University recognition: the group "must be successful in aiding the University's educational mission in the tradition established by its founders (as outlined in the University's Statement of Educational Goals and Objectives)" and "must provide a broad service to the University community in the sense that the activities of the group may not be of an immediate and/or special interest."

"Recognition Criteria" is relevant here because of Georgetown's effort to establish, through this document, that "University recognition" means "endorsement"—the concept that underlies its free exercise defense. More specifically, Georgetown maintains that the policies and procedures of "Recognition Criteria" were inherent in the University's administration of WYCNTK, as well as in the Law Center's processing of student group applications, and thus it applied to all the applications at issue here. Appellants, to the contrary, attempt to show that "Recognition Criteria" is a pretextual, "self-serving document" that did not assuredly govern GPGU's and GRC's applications. See su-

pra note 5. According to appellants, therefore, "University recognition" implies only a neutral acknowledgement of a group's existence, not an "endorsement" of its goals and activities.

Georgetown's argument is more persuasive. As elaborated above, the basic document, WYCNTK, both in its language and as properly administered, reflected the University's right to withhold "official recognition" of a student activity that was not consistent with "the University's educational mission." Dean Schuerman—whose rejection of GPGU's first application referred to the University's refusal to "endorse" the group—testified that, since he had begun teaching at Georgetown, he had understood "recognition" to mean "endorsement" and that his understanding had never changed. President Healy and Dean McCarthy of the Law Center also testified that they understood recognition of a student group to imply endorsement. The record shows, moreover, that the University's public and internal statements have explicitly sounded a recognition/endorsement theme. Therefore, as to both GPGU's and GRC's applications, see supra note 8, the trial court's findings that "Recognition Criteria" provided the basis for analyzing Georgetown's constitutional defense, and thus that "[t]he major purpose of 'university recognition' is official endorsement," are not "clearly erroneous." Blanken & Blanken Investments, Inc. v. Keg, Inc., 383 A.2d 1076, 1078 (D.C.1978); see D.C.Code § 17–305(a) (1981). We accordingly accept these findings for purposes of appeal.[9]

8. As to GRC's application, we know considerably less about the factors underlying its approval by the student committee and the law faculty and its denial by the Dean. Georgetown admits that there are "no written criteria for evaluating applications by law student organizations for formal approval. Rather, each application is considered on its own merits and is decided ... on the basis of common sense, consensus, and an informed judgment concerning the best interest of the institution." Both Dean Schuerman and Dean McCarthy testified that "Recognition Criteria"—and, presumably, its three-tier analysis—did not apply to student group appli-

cations at the Law Center. GRC's application, however, appears designed to meet criteria similar to those explicitly set forth for main campus groups seeking recognition. Dean McCarthy's memorandum of February 26, 1980, rejecting GRC's application for recognition and funding, substantially tracks Dean Schuerman's replies to GPGU and equates official recognition with University endorsement.

9. The only substantive difference between "Recognition Criteria" and the recognition policy administered under WYCNTK is the additional facilities support now inherent in "University

### E.

Before proceeding to the constitutional analysis, it is important—in evaluating the extent of the burden on Georgetown's exercise of religion at issue here—to determine more precisely what "endorsement" means, since the trial court failed to make that clear. The record establishes that University recognition/endorsement has both a practical and a normative meaning.

### (1)

The practical meaning of University recognition, as endorsement, can be discerned by reference to the visible, though lesser, status which the University willingly has granted GPGU and GRC by permitting student body endorsement with attendant use of the University's name and facilities. As Dean Schuerman's memorandum and "Recognition Criteria" confirm, a student body-endorsed organization has a number of privileges which, if taken advantage of, will make it a recognizable, if not officially endorsed, presence on the University campus; for example, access to University facilities and to the monthly student activities calendar, as well as the opportunity to apply for lecture fund privileges.

Although there was uncontradicted testimony that both GPGU and GRC had greater difficulty than officially recognized groups in scheduling meeting rooms, these groups have taken considerable advantage of the opportunities afforded by their student body endorsement (GPGU) and Law Center committee recognition (GRC). James Ryan testified, for example, that during the two years he was president of GPGU, the group met almost weekly, had activities in campus facilities, posted notices of meetings on campus, and brought in outside speakers. Counsel on both sides, in closing argument to the trial court, as well as in oral argument on appeal, readily agreed that GPGU and GRC, for a substantial period of time, had had the opportunity to use University facilities and thus had

established their presence, with the University's support, as groups on campus.

Dean Schuerman testified, however, that permitting a gay rights group to use University facilities in this manner did not mean that Georgetown endorsed or approved its activities or beliefs or that Georgetown was violating the teachings of the Roman Catholic Church. President Healy and Dean McCarthy testified to the same effect. In response to such testimony, the argument of appellants' counsel is telling: "If these privileges are extended to plaintiffs without violating church teachings," then it is difficult to discern how the addition of University recognition, with or without a few similar, additional privileges, *see supra* note 9, "violate[s] Catholic Church teachings." That is to say, if there is no burden on Georgetown's exercise of religion at the first (student body) level of endorsement—with all the visibility and privileges allowed by the University—then in practical terms, at least, it is not readily apparent how University recognition would provide an additional kind of endorsement that creates, for the first time, a constitutionally significant religious burden.

The answer to this question whether the University's religious line-drawing is constitutionally protected may depend on the normative meaning of University recognition/endorsement, to which we now turn.

### (2)

The trial court's finding that University "recognition" means "endorsement" is interpretable, to some extent, by reference to Georgetown's willingness to recognize other groups as diverse as the Jewish Students Association, the Organization of Arab Students, the Young Americans for Freedom, and the Democratic Socialist Organizing Committee. The meaning of "endorsement" can be further understood by noting Georgetown's willingness to permit the birth control and abortion rights activi-

recognition." Because Georgetown and the trial court premise this case on "Recognition Crite-

ria," we proceed on the understanding that this additional support is at issue.

ties of the Women's Rights Collective, another University-recognized group.[10] Obviously, the Roman Catholic Church does not affirm all the conflicting positions of these particular groups, let alone the activities of recognized groups that unquestionably conflict with Catholic teachings. Nor does Georgetown so contend. Thus, the University's recognition/endorsement of these groups, but not of the gay rights groups, at most can mean—as Georgetown appears to concede—that the philosophies and activities of recognized groups are not necessarily or predominantly inconsistent with Roman Catholic teachings (at least from an apolitical or ecumenical perspective), whereas appellants' philosophies and activities are. While this distinction may be logical, it reveals that the only "endorsement" implied by "recognition" is an expression of tolerance. It does not necessarily indicate "approval," as the University contends.

Under the circumstances, therefore, even though we accept the trial court's finding that University recognition implies endorsement, it is clear that such endorsement is not much of an affirmation, if any. To the contrary, endorsement means merely that the University will tolerate a considerable diversity of philosophies and activities which are not inconsistent with Catholic Church teachings, and that the University will even support activities which are offensive to those teachings, such as pro-birth control and pro-abortion programs, when the sponsoring student group is not primarily organized to achieve those particular ends. *See supra* note 10.

(3)

In sum, the University recognition/endorsement at issue here would mean no more than "official tolerance" of gay rights groups—groups which Georgetown, without violating Catholic teachings, has already, though unofficially, permitted to use the University's name and facilities like any other group.

II.

With this background—and on the assumption that the University corporation[11] has standing[12] to raise a free exercise de-

10. Dean McCarthy of the Law Center testified that WRC's distribution of a pamphlet listing area clinics providing abortions did not make WRC a "pro-abortion group" and that he took no effort to stop the Pro Choice Forum sponsored by WRC in 1980 because discussion of this moral and social problem "was not an activity which ought to have been banned by me." President Healy testified that, in granting recognition to WRC, the University was not endorsing elements of the women's movement that are pro-abortion or pro-birth control, and that the WRC's distribution of pro-abortion literature did not violate Roman Catholic teachings. Dean McCarthy opined that such activities were "not essential to their [WRC's] being," and President Healy viewed them as "such minor instances of activity as not to be of serious concern to the university."

11. For purposes of this case, we assume that the legally significant representative of Georgetown, for purposes of asserting the "University's" constitutional rights, is the University corporation, represented by the University administration. Thus, we need not get into the question of "who" is a university, given its many constituencies with often conflicting positions, both within each group and vis-a-vis each other: board of directors, administrators, faculty, students, alumni.

12. Appellants argue that Georgetown is fundamentally a secular institution without standing to assert a free exercise defense. They note, for example, that: Georgetown students need not be members of the Roman Catholic Church; there is no requirement that Georgetown's Board of Directors, administrators, or instructors, be Catholic; there is no requirement that students or faculty participate in religious exercises; there is no evidence that Georgetown trains a substantial number of its students for religious vocations; Georgetown's basic educational mission is secular, not religious; Georgetown's motto is ecumenical, "Making of one—Jew and Gentile"; and Georgetown's atmosphere is one of academic freedom.

Georgetown, on the other hand, stresses its relationships with the Roman Catholic Church and the Society of Jesus for over 200 years. Until recent times, the Jesuits directly owned the University; since 1969, it has operated under a contract with that priestly order. Virtually all 45 presidents of the University have been Jesuits, and the governing contract provides

fense—we turn to the question whether the Constitution protects Georgetown against enforcement of the Human Rights Act, which would compel the University to accord the student gay rights groups the particular form of recognition/endorsement available to other campus organizations recognized by SAC or by the Law Center's Committee on Student and Faculty Life.

In *Bob Jones University v. United States*, 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983), the Supreme Court recently elaborated how courts should address government action that allegedly infringes upon free exercise rights. Specifically, the Court sustained the denial of a federal tax exemption for a private, religious university which banned interracial marriage and dating among its students. The Court rejected the university's defense that the Commissioner's action violated its right under the free exercise clause of the First Amendment, as a private institution, to "engage in racial discrimination on the basis of sincerely held religious beliefs." 461 U.S. at 602, 103 S.Ct. at 2034 (footnote omitted). The Court noted that " '[n]ot all burdens on religion are unconstitutional.... The state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest.' " 461 U.S. at 603, 103 S.Ct. at 2035 (quoting *United States v. Lee*, 455 U.S. 252, 257–58, 102 S.Ct. 1051, 1055–56, 71 L.Ed.2d 127 (1982)). The Court then found "compelling" and "overriding" the governmental interest at stake: "eradicating racial discrimination in education." 461 U.S. at 604, 103 S.Ct. at 2035. Noting that

no "less restrictive means" than denial of the exemption were "available to achieve the governmental interest," the Court held that this interest "substantially outweighs whatever burden denial of tax benefits places on petitioners' exercise of their religious beliefs." *Id.* The Court recognized the extent of—and the limitation on—the impact of its ruling: "Denial of tax benefits will inevitably have a substantial impact on the operation of private religious schools, but will not prevent those schools from observing their religious tenets." *Id.* at 603–04, 103 S.Ct. at 2035.

### A.

We must determine, initially, whether the District's interest in enforcing the Human Rights Act—in this case, to prevent discrimination by educational institutions against student groups based on sexual orientation—is "compelling" or "overriding." *Id.* at 604, 103 S.Ct. at 2035. We conclude that it is.

The Act manifests an equal interest in eradicating discrimination in educational institutions with respect to a wide range of concerns from race through sex, age, sexual orientation, and physical handicap—whether constitutionally based or not. *See supra* note 1. In the statutory preamble, the Council declared:

It is the intent of the Council of the District of Columbia, in enacting this chapter, to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit, including, but not limited to, discrimi-

that, whenever practical, Jesuits will fill other administrative positions. The University has a theology department; it is one of two Pontifical Universities in the United States empowered to grant ecclesiastical degrees; and it requires all undergraduates to take two courses in theology. Finally, Georgetown always has proclaimed that it is a Roman Catholic, Jesuit institution, and that it conducts itself in conformity with the faith, teachings, and traditions of the Catholic Church.

Clearly, Georgetown—a religiously affiliated university—falls somewhere between a purely

sectarian and altogether secular institution. We are satisfied that the University's assertion of a free exercise defense has sufficient legal credibility, under these circumstances, to permit us to proceed to the merits without belaboring the standing issue. *Cf. Bob Jones University v. United States*, 461 U.S. 574, 580, 103 S.Ct. 2017, 2022, 76 L.Ed.2d 157 (1983) ("fundamentalist Christian religious" university "not affiliated with any religious denomination" asserts free exercise defense). Obviously, were the outcome different here, we would have to resolve standing definitively.

nation by reason of race, ... sex, ... sexual orientation....

D.C.Code § 1–2501 (1981).

In two decisions citing § 1–2501, we have stressed, from the legislative history, how significant the Council's concern was for combatting discrimination:

> "Enactment of Title 34's provisions as the Human Rights Act would underscore the Council's intent that the elimination of discrimination within the District of Columbia should have the 'highest priority.'" *Report of the Council of the District of Columbia, Committee on Public Services and Consumer Affairs,* July 5, 1977 at 3.

*Howard University v. Best,* 484 A.2d 958, 978 (D.C.1984) (sex discrimination). And again:

> The Council "affirmatively and forcefully convey[ed] to the executive and administrative agencies of the District Government the importance which the Council places on vigorous enforcement of [the Act]." Committee Report of Bill 2–179, "The Human Rights Act of 1977," July 5, 1977.

*Greater Washington Business Center v. D.C. Commission on Human Rights,* 454 A.2d 1333, 1337 (D.C.1982) (sex discrimination).

Accordingly, there is every indication in the statute, as well as from its legislative history, that the Council of the District of Columbia accorded the "highest priority" to "vigorous enforcement" of the Act in eradicating every proscribed form of discrimination. We conclude that the District's expressed interest in eliminating discrimination in educational institutions on the basis of sexual orientation is as "com-

pelling" or "overriding" as it is in the more traditional areas of race and sex. *Cf. Roberts v. United States Jaycees,* — U.S. ——, 104 S.Ct. 3244, 3253, 82 L.Ed.2d 462 (1984) (Minnesota has "compelling interest in eradicating discrimination against its female citizens"); *Bob Jones,* 461 U.S. at 604, 103 S.Ct. at 2035 ("eradicating racial discrimination in education" is "compelling" and "overriding" governmental interest).[13]

### B.

The District, of course, may not enforce its "compelling interest" under the Act by requiring Georgetown to grant appellants "University recognition" unless there are no "less restrictive means" of achieving the statutory purpose. *Id.* Because the gay rights groups ostensibly have equal access to University facilities by virtue of their charters minus "official recognition," it is necessary to evaluate whether "University Recognition," in contrast with "Student Body Endorsement," is a significant right which these groups must be guaranteed in order not to suffer from proscribed discrimination.

We note, first, that despite the guarantees expressed in Dean Schuerman's and Dean McCarthy's memoranda, and despite appellants' demonstrated access to University facilities, there is uncontradicted record evidence that the University's commitment to such access is less solid than it is for officially recognized groups; meeting rooms, for example, are harder to obtain. *See supra* Part I.E. (1). University recognition, therefore, may be necessary to assure nondiscriminatory access to facilities which any official student activity may use.[14]

---

**13.** Our conclusion is buttressed by the fact that the Council knew how to make exceptions under the Act. The statute exempts religious or political organizations from compliance to the extent of permitting such groups to give "preference to persons of the same religion or political persuasion" in connection with employment, *sales,* housing rentals, or admission. D.C.Code § 1–2503(b) (1981), incorporated in *id.* § 1–2520; *supra* note 1. No other limitation on the

state's interest is expressed, and no one claims that this exemption is applicable here.

**14.** Under "Recognition Criteria," Georgetown now grants a University-recognized group automatic access to more facilities than a Student Body-endorsed group automatically may use. Thus, there now is a larger tangible benefit at issue than there was under WYCNTK. *See supra* note 9. For purposes of this appeal, we understand that the University considers all the

Presumably, however, the court could cure this particular inequality by ordering equal access to facilities without compelling University recognition. The real question, therefore, is whether the District's compelling interest in enforcing the Act requires that Georgetown accord appellants not only equal access to facilities but also equal citizenship—a status available only through official recognition.

The answer is yes. To hold otherwise would be to impose an intangible but significant "condition" on the right of nondiscriminatory access which the Human Rights Act condemns. D.C.Code § 1–2520 (1) (1981), *supra* note 1. Status—indeed, respect for personal dignity—not merely access to facilities, is the critical concern here. Absent University recognition, appellants would still be the objects of discrimination. No less restrictive means than University recognition itself will implement the purposes of the Act.

### C.

The question then becomes whether the District's compelling interest under the Act in affording the gay rights groups "University recognition"—for which "no less restrictive" alternative is available—"substantially outweighs" the burden placed on Georgetown's free exercise rights.

Georgetown claims a substantial burden paramount to the District's interest here. Georgetown asks us to distinguish *Bob Jones* on the ground that, in the present case, "the denial of a benefit to the University is not at issue, but rather the compelled affirmance of an ideology repugnant to its religious belief." Therefore, asserts the University, if the gay rights groups prevail, Georgetown will be prevented "from observing [its] religious tenets." *Id.* at 604, 103 S.Ct. at 2035.

### (1)

In support of this distinction, Georgetown cites *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), in which the Court held that the State of New Hampshire could not require objecting Jehovah's Witnesses, under threat of criminal penalty, to display the state motto, "Live Free or Die," on their vehicle license plates. The Court concluded that the state's interest was not sufficiently compelling to outweigh the First Amendment right not to broadcast a state-prescribed message contrary to one's moral and religious beliefs. The Court premised its opinion not on the free exercise clause but on freedom of speech—"the right to speak freely and the right to refrain from speaking at all," 430 U.S. at 714, 97 S.Ct. at 1435—and likened New Hampshire's statute to a requirement "that appellees use their private property as a 'mobile billboard' for the State's ideological message." 430 U.S. at 715, 97 S.Ct. at 1435.

Georgetown argues, similarly, that state-compelled recognition/endorsement of the gay rights groups would, in effect, force the University to embrace, or at least to communicate, an ideological message repugnant to its religious beliefs—an argument reinforced by two earlier cases: *Torcaso v. Watkins*, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961) (declared unconstitutional, primarily by reference to establishment clause, Maryland statute requiring applicants for Notary Public commissions to swear belief in God) and *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (declared unconstitutional on free speech grounds state action requiring school children, who objected on reli-

facilities support inherent in "University recognition" to be part of the intangible "recognition" benefit, rather than a "subsidy" or "funding." Thus, we do not consider it necessary to determine whether the finding that "Recognition Criteria" controls this case implies that enforcement of the Human Rights Act compels George-

gious grounds, to salute flag and pledge allegiance).[15]

### (2)

In the present case, however, as appellants point out, the state—the' District of Columbia—is not imposing a religious affirmation. Unlike the state's forcing Jehovah's Witnesses to broadcast an ideological message (*Wooley*) or to salute and pledge allegiance to the flag (*Barnette*), and unlike the state's requirement that a notary public applicant swear a belief in God (*Torcaso*), the Human Rights Act requirement that Georgetown officially recognize gay rights groups on a nondiscriminatory basis does not necessarily imply that the University administration is spreading, let alone affirming, gay rights views. Enforcement of the Human Rights Act means something

less—something attenuated: that certain student groups in a pluralistic university environment must have nondiscriminatory access to Georgetown's facilities to publicize messages they ascribe only to themselves, not to the University.

The Supreme Court has recognized such a distinction in *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). There, the Court upheld a California state constitutional provision construed to require privately owned shopping centers to permit individuals reasonably to exercise their free speech and petition rights on shopping center property. The Court rejected the property owner's contention, based on *Wooley*, that he had "a First Amendment right not to be forced by the State to use his property as a forum

---

town to afford gay rights groups a financial subsidy in addition to official recognition.

**15.** Georgetown's reliance on free speech cases requires comment here. In evaluating alleged violations of the free exercise clause, the Supreme Court has inquired into whether the religious beliefs were sincerely held and whether the prohibition or requirement at issue conflicted with a central tenet of one's faith. *See generally* L. TRIBE, AMERICAN CONSTITUTIONAL LAW § 14–11 (1978). As to the latter, centrality question, Professor Tribe has written: "Clearly a conflict which threatens the very survival of the religion or the core values of a faith poses more serious free exercise problems than does a conflict which merely inconveniences the faithful." *Id.* § 14–11, at 862. He notes, however, that judicial inquiry into centrality can produce dangerous infringements on religious liberty. Thus, "*Sherbert v. Verner* [374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)] and its progeny are especially significant in departing from any purportedly 'objective' judicial notion of what constitutes the core of a religion, and in moving toward the view that the core of any religion must always be derived from the perspective of the religion itself,'"*id.* § 14–11, at 863 (footnotes omitted)—an essentially subjective judgment. *See, e.g., United States v. Lee,* 455 U.S. 252, 257, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982). Given this emphasis on subjectivity, there will always be a "tension between generously accommodating religious liberty and assuring that religion is not invoked as a cheap excuse for every conceivable form of self-indulgence." L. TRIBE § 14–11, at 864. The Supreme Court, accordingly, has often avoided addressing that tension "by recognizing rights independent of what

one's private reasons for resisting an intrusion might be." *Id.* Thus, in *Wooley* and *Barnette,* for example, the Court premised its opinions on First Amendment free speech rights and "avoided the dangers of inquiring into the genuineness and centrality of such religious views as were advanced." L. TRIBE § 14–11, at 865 (footnote omitted).

In view of this background, we might well have to inquire into the sincerity or centrality of Georgetown's religious defense or else find another First Amendment right on which to premise our discussion. However, we do not doubt the sincerity and centrality of the religious view—disapproval of homosexual conduct—asserted by Georgetown in this case. Accordingly, Georgetown's First Amendment claim under the free exercise clause is no weaker than it would be under a free speech rubric. We therefore find *Wooley* and *Barnette* instructive here insofar as they deal with coerced religious expression. So is *Torcaso*, which the Court on at least one occasion has cited for its free exercise implications. *See Sherbert*, 374 U.S. at 402, 83 S.Ct. at 1792.

It is important to note, however, that while the legitimacy of a free exercise claim is based on the subjective "perspective of the religion itself," L. TRIBE § 14–11, at 863, it is nonetheless subject to the objective balancing test articulated most recently in *Bob Jones*: whether a compelling governmental interest substantially outweighs the burden that would be placed on the exercise of religious beliefs. Conduct implementing a sincerely held religious belief, central to the faith—as in *Bob Jones* and *Lee*—does not automatically preclude state action that infringes on that conduct.

for the speech of others." 447 U.S. at 85, 100 S.Ct. at 2043 (footnote omitted). The Court distinguished *Wooley* in a number of ways: First, the shopping center, unlike a licensed vehicle, was not limited primarily to the personal use of the owner; it was a business establishment open to the public. Therefore, the "views expressed by members of the public in passing out pamphlets or seeking signatures for a petition . . . will not likely be identified with those of the owner." 447 U.S. at 87, 100 S.Ct. at 2044. Second, the state did not dictate a specific message to be displayed on the center's property; thus, there was "no danger of governmental discrimination for or against a particular message." *Id.* Finally, the shopping center could "expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers stand. Such signs, for example, could disclaim any sponsorship of the message and could explain that the persons are communicating their own messages by virtue of state law." *Id.*

Appellants accordingly stress that, in granting them recognition, Georgetown University—inherently structured as a marketplace of ideas (clearly more so than a shopping center)—is not likely to be identified, institutionally, as a promoter of gay rights. Nor would it be governmentally compelled to embrace a particular message. Finally, Georgetown could affirmatively disassociate itself from gay rights views and activities if it were truly worried about overidentification with them. In short, *PruneYard* tends to support appellants' argument that University recognition of a student group does not necessarily imply endorsement in the sense of approval.

Furthermore, *PruneYard*, as well as *Bob Jones*, reflects another significant distinction. In *Wooley, Torcaso,* and *Barnette,* the rights asserted did not bring the complainants "into collision with rights asserted by any other individual. . . . The

sole conflict [was] between authority and rights of the individual." *Barnette,* 319 U.S. at 630, 63 S.Ct. at 1181; *see Sherbert v. Verner,* 374 U.S. 398, 409, 83 S.Ct. 1790, 1796, 10 L.Ed.2d 965 (1963). In the present case, however, as in *Bob Jones* (free exercise) and *PruneYard* (free speech), conflicting individual rights are alleged—here, freedom from unlawful discrimination and free exercise of religion—which "require intervention of the State to determine where the rights of one end and those of another begin." *Barnette,* 319 U.S. at 630, 63 S.Ct. at 1181. In this situation, free exercise rights are not the only individual rights at issue, and thus to this extent *Wooley, Torcaso,* and *Barnette* are inapposite.

*PruneYard* also, however, in an important respect is distinguishable from this case. None of the diverse views of the public was likely to be attributed to the owner of a commercial shopping center: the speakers and petitioners were not using the shopping center's name; and, unlike a private university such as Georgetown, a shopping center is not an institution known for espousing particular dogma.[16] *PruneYard,* therefore, does not conclusively support appellants' position.

### D.

The question, then, is whether the *Wooley-Torcaso-Barnette* analogy or the *PruneYard* analysis is more applicable here in evaluating the burden on Georgetown's free exercise rights. We conclude that *PruneYard's* analysis is controlling for two reasons: (1) the limited "endorsement"—mere tolerance—inherent in University recognition of diverse student groups at Georgetown would not imply "approval" of gay rights and thus would impose a relatively slight burden on the exercise of religion, in contrast with the compelled affirmations in *Wooley, Torcaso,* and *Barnette;* and (2) the conflict of indi-

16. Courts have said that "recognition" of a student group by a public university—which cannot promote particular religious or other dogma—does not imply endorsement of the group's aims or activities. *E.g., Gay Alliance of Students v. Matthews,* 544 F.2d 162, 165 (4th Cir.1976).

vidual rights at issue here, as in *Prune-Yard* and *Bob Jones*, requires this court to evaluate the respective burdens when one or the other prevails, *see Sherbert*, 374 U.S. at 409, 83 S.Ct. at 1796; *Barnette*, 319 U.S. at 630, 63 S.Ct. at 1181, in contrast with *Wooley*, *Torcaso*, and *Barnette*, where only the state's interest, as such, threatened the complainants. As a result, we conclude that the burden on Georgetown is sufficiently "incidental," *Sherbert*, 374 U.S. at 403, 83 S.Ct. at 1793, when compared with the deprivation that appellants otherwise would confront, that the District's interest in enforcing the Act here is paramount.[17]

### (1)

When we focus on the religious burden on Georgetown, the claim that University recognition implies endorsement—in the sense of approval—is substantially undermined by Georgetown's willingness to tolerate, as consistent with Roman Catholic teachings, student body endorsement of gay rights groups with attendant use of the University's facilities and name. *See supra* Part I.E. (1). It is further undermined by Georgetown's recognition of many diverse groups whose views and activities often are irreconcilable with one another and in some instances directly conflict with Catholic teachings. *See supra* Part I.E. (2). As a result, as we have demonstrated, such recognition at most implies tolerance, not approval. It is therefore difficult to perceive how University recognition would imply to students, faculty, alumni, and outsiders—indeed, to anyone other than the University corporation/administration itself—a more positive approval of gay rights activities than that already implied by appellants' visible though unofficial access to facilities on a basis virtually equal to that of other groups, especially because the variety of

recognized groups necessarily dilutes the normative significance of recognition as such.

Although *PruneYard* may be a more clearcut case in which expression of ideas and values could not reasonably be imputable to the forum's owner, we believe that the likelihood of attributing gay rights views to Georgetown, through University recognition of still another student group in a pluralistic environment, is virtually as remote as the alleged imputation in *Prune-Yard*, despite the fact that the University is known to have dogmatic principles and that appellants (like so many other student groups) use Georgetown's name. In any event, from the viewpoint of virtually anyone but the University corporation/administration itself, the realities here are much closer to those in *PruneYard* than to the compelled affirmations or advertisements of the government-prescribed messages struck down in *Barnette*, *Torcaso*, and *Wooley*. If Georgetown nonetheless believes that University recognition, as official tolerance, implies greater approval than we perceive, then it can easily eliminate that burden by expressing its views to the contrary, to whatever constituents or others it wishes to notify, through official publications or otherwise as in *PruneYard*.

### (2)

There is, however, a second aspect of the "burden" issue attributable, very simply, to Georgetown's feeling of coercion. We must address Georgetown's argument that the implications of "University recognition" to students, faculty, alumni, and outsiders do not comprise the central constitutional concern. The principal issue, according to Georgetown (as counsel on appeal have characterized it), is whether Georgetown's governing authority can be forced to "tell

---

**17.** Georgetown does not complain that enforcement of the Human Rights Act, in this case, would compel the University to finance activities odious to Catholic teachings. *Compare Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (teachers may invoke First Amendment rights against compelled financial support of union's political activities as condition of employment). Although some subsidy is inherent in making University facilities available, Georgetown has elected to claim constitutional protection only with respect to its asserted right not to accord an intangible: recognition. *See supra* note 14.

itself" it endorses a particular group. Put another way, Georgetown asserts—citing *Wooley, Torcaso,* and *Barnette*—that it has an absolute right, under the free exercise clause, to define what offends its religious beliefs. Therefore, we are told, only the University corporation itself, not the District of Columbia, has the right to determine whether University recognition/endorsement of a student group violates Georgetown's religious conscience, without regard to the implications—to anyone else—of appellants' student body endorsement and attendant use of Georgetown's name and facilities, or of Georgetown's official recognition of diverse other groups. In short, according to Georgetown, the state cannot, constitutionally, infringe on the University's right to interpret—and apply—its religious tenets as it sees fit, however illogical its religious line-drawing may appear to others. *See Lee,* 455 U.S. at 257, 102 S.Ct. at 1055 ("It is not within the 'judicial function and judicial competence' ... to determine whether appellee or the Government has the proper interpretation of the Amish faith") (citation and footnote omitted).

While we agree that it is not for this court to interpret the Catholic faith—nor are we doing so—we cannot agree that Georgetown's particular application of unquestioned religious tenets has absolute

priority here.[18] The balancing test traditionally applied—whether the state has a compelling interest that substantially outweighs the burden on one's exercise of religious beliefs—is an objective one; it is not linked exclusively to the subjective position of the party asserting, or challenging, a religious viewpoint. *See supra* note 15. If it were, Bob Jones University would have prevailed against the government's action on behalf of Bob Jones' minority students. Accordingly, the fact that Georgetown rests its cause on sincerely held religious beliefs central to its faith—which we do not probe or doubt—is not conclusive. A balancing test is still required[19]—one that does not merely pit the District against Georgetown but, more broadly, accounts for the conflict of individual rights at issue here. *See Sherbert,* 374 U.S. at 409, 83 S.Ct. at 1796; *Barnette,* 319 U.S. at 630, 63 S.Ct. at 1181.

We have explained, by reference to *PruneYard,* why University recognition/endorsement does not "tell" Georgetown constituents or outsiders that the University approves of gay rights. Similarly, despite sincerely feeling coerced by the Human Rights Act into treating student groups in a particular way, Georgetown's governing body, while granting gay rights groups officially recognized status on cam-

**18.** We have not questioned the sincerity or centrality to the faith of Georgetown's disapproval of homosexual conduct. *See supra* note 15. In assessing the religious burden on Georgetown at issue here, however, we have properly had to evaluate the nature of the conduct Georgetown wishes to carry out, in exercising its religious beliefs, for freedom to act in furtherance of religion is not absolute. *Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940), *quoted in Torcaso,* 367 U.S. at 492, 81 S.Ct. at 1682. Accordingly, in characterizing University recognition/endorsement as "tolerance," not "approval," on this record, we are interpreting not the nature of Georgetown's faith but only the nature of the burden on the faith that enforcement of the Human Rights Act would impose.

**19.** *Compare Bob Jones,* 461 U.S. at 603–04, 103 S.Ct. at 2034–35 (government's "compelling" interest in "eradicating racial discrimination in

education" substantially outweighs religious university's sincerely held belief in such discrimination) *and United States v. Lee,* 455 U.S. 252, 257–60, 102 S.Ct. 1051, 1055–57, 71 L.Ed.2d 127 (1982) ("overriding governmental interest" precludes Amish from refusing to pay compulsory Social Security taxes that "interfere with their free exercise rights") *with Wisconsin v. Yoder,* 406 U.S. 205, 214–15, 92 S.Ct. 1526, 1532–33, 32 L.Ed.2d 15 (1972) (state's interest in enforcing compulsory school attendance law not "of sufficient magnitude to override the interest" of Amish, asserted under free exercise clause, to education of their own children) *and Sherbert,* 374 U.S. at 403–09, 83 S.Ct. at 1793–97 (state's interest in denying unemployment benefits to Seventh-Day Adventist, who declined to take available employment requiring work on Saturdays, was not "compelling" enough to justify "substantial infringement" of appellant's free exercise rights).

pus, need only tell itself that it does not discriminate, not that it approves of gay rights; no antidiscrimination law can impose mind control. In sum, unlike the Jehovah's Witnesses in *Wooley* and *Barnette,* or the notary public applicant in *Torcaso,* Georgetown, as an institution—in complying with the Human Rights Act—need not manifest to others, let alone to itself, its approval of any cause which its governing authority wishes not to approve.

But even if Georgetown claims that such official tolerance of gay rights groups offends central, sincerely held religious beliefs, the burden on Georgetown—a mere acknowledgement of tolerance—is slight when compared with the District's interest in enforcing the Act. No one, including Georgetown itself, need mistake Georgetown's own religious position—disapproval of homosexual conduct—if it grants University recognition to appellants. If Georgetown is concerned that anyone will misread the situation, it can communicate its own position freely and state that appellants are officially recognized "by virtue of [District] law." *PruneYard,* 447 U.S. at 87, 100 S.Ct. at 2044. On the other hand, if Georgetown has its way here, the District's interest in enforcing nondiscriminatory treatment under the Act on behalf of an ostracized class of individuals would be wholly frustrated.

## III.

*Bob Jones'* outcome accordingly controls. The District of Columbia's interest in enforcing the Human Rights Act's prohibition of discrimination based on sexual orienta-tion "substantially outweighs whatever burden" the Act places on Georgetown's "exercise of [its] religious beliefs." *Bob Jones,* 461 U.S. at 604, 103 S.Ct. at 2035. Georgetown University and its Law Center, therefore, must grant "University recognition" to GPCU and GRC, respectively.

*Reversed.*

MACK, Associate Judge, dissenting:

Requiring the Georgetown University to recognize/endorse two gay rights groups is tantamount to ordering a private actor publicly to embrace the ideology of another. I cannot concur in this bizarre result; I would hold that the Human Rights Act does not compel recognition/endorsement. I would sever the connection between recognition and its incidental benefits, and would find that by withholding recognition the University has not violated the Act.

On this issue my colleagues say only that "Georgetown has not challenged on appeal the [motions] court's ruling that the University's actions [in withholding recognition to the plaintiffs] unlawfully discriminated on the basis of sexual orientation." *Ante* at 568. It is beyond cavil, however, that when a constitutional challenge to a statute is raised, this court must first determine whether a "construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932). The alternative construction is so evident here as to require little discussion. As the majority circuitously concedes, a civil rights act does not (and could not) impose mind control. *Ante* at 581.[1]

1. An amicus brief submitted on this appeal by Arthur B. Spitzer has strongly urged this court to review and reverse the finding by the motions court (Judge Braman) that by withholding recognition, Georgetown has violated the Human Rights Act. Such a holding would of course make it unnecessary to reach the constitutional question decided by the trial court (Judge Bacon, presiding), namely, whether Georgetown's free exercise right outweighs the District's interest in enforcing its statute so as to require recognition. Similarly, the State of Wisconsin, the first state to enact laws outlawing

discrimination on the basis of sexual orientation, has filed an amicus brief urging us to require the university simply to sever the connection it has fashioned between "endorsement" and the extension of tangible and financial benefits. Amicus Brief submitted on behalf of Wisconsin Governor's Council on Lesbian and Gay Issues [Governor's Council] at 4–7. As the Governor's Council aptly notes, the D.C. Human Rights Act "does not and cannot directly address personal or religiously held beliefs or thoughts." *Id.* at 4. While the university may thus be "entitled to withhold [its] endorsement," a bal-

The motions court found, and the majority today agrees, that the Human Rights Act does not permit Georgetown to communicate to students, faculty, alumni and the outside world—via a withholding of recognition—its disapproval, as a private, Catholic entity, of a group whose practices and goals conflict with Catholic belief. Perhaps recognizing the patent invasion of the First Amendment that its holding implies, the majority finds that Georgetown may evade the Human Rights Act's requirements by disclaiming that endorsement, or by "telling itself" that it does not actually tolerate the plaintiff student groups. In this regard, the majority accepts the trial court's finding that "university recognition" is the equivalent of university "endorsement," but it independently decides that endorsement implies no approval. The plain meaning of "endorsement," however, according to Webster's, is a "public and definite expression of approval." I will not belabor the point, for I believe that for constitutional purposes it is irrelevant whether recognition implies endorsement/approval or whether it indicates only neutrality, i.e., that the doctrine espoused by the recognized group is not in direct conflict with Catholic principles. In either event, I would construe the Act to exclude the majority's result: that a private university affiliated with the Catholic church may be compelled to endorse, or even to be religiously neutral towards, a student group whose fundamental purpose and organizing principle conflict with Catholic doctrine. While it may require equal access by university groups to university facilities,[2] the Act should not be construed to mandate what is in effect coerced speech. Although the university relies on the free exercise clause of the First Amendment, rather than the free speech clause, restrictions on religious speech of the type presented here have often been analyzed, and struck down, on free exercise grounds. *Fowler v. Rhode Island,* 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953); *Follett v. Town of McCormick,* 321 U.S. 573, 64 S.Ct. 717, 88 L.Ed. 938 (1944); *Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); *Jamison v. Texas,* 318 U.S. 413, 63 S.Ct. 669, 87 L.Ed. 869 (1943); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

The free exercise clause traditionally has embraced two concepts: freedom to believe and freedom to act. The first "is absolute." *Cantwell v. Connecticut,* 310 U.S. at 303, 60 S.Ct. at 903. In its initial opinion interpreting the reach of the clause, the Supreme Court held that the function of the prohibition is to deprive government "of all legislative power over mere opinion." *Reynolds v. United States,* 98 U.S. (8 OTTO) 145, 164, 25 L.Ed. 244 (1878). The principles embraced within this "absolute" core of the clause, freedom of conscience, thought, and religious practice, are "sacred private interests, basic in a democracy." *Prince v. Massachusetts,* 321 U.S. 158, 165, 64 S.Ct. 438, 441, 88 L.Ed. 645 (1944).[3] As such, they cannot be subject to a "balancing" test, like the one set up by the majority, where they may be "trumped" by a state interest deemed to be more "compelling."[4]

---

ancing test as applied to endorsement's incidental benefits, the Council argues, would require the university to extend tangible benefits equally to student groups under the Act. *Id.* at 5. The result would be that "[t]he University could withhold or grant endorsement and approval as it chooses so long as there is no further tie to benefits." *Id.* at 6. Although I express no view on the question of tangible benefits, I believe that the Council's approach is the correct one. *See infra.*

**2.** *See infra* at p. 586.

**3.** As Judge Bacon pointed out in her opinion, "the rights of conscience are, in their nature, of peculiar delicacy, and will little bear the gentlest touch of governmental hand...." Memorandum of Decision and Judgment at 2 (citing *Braunfeld v. Brown,* 366 U.S. 599, 616, 81 S.Ct. 1144, 1152, 6 L.Ed.2d 563 (1961) (Brennan, J., concurring and dissenting (citation omitted)).

**4.** The "balancing test" has relevance only to governmental restrictions on conduct. *Cantwell v. Connecticut, supra,* 310 U.S. at 303–04, 60 S.Ct. at 903. The majority's statement that a "sincerely held religious belief, central to the

"Official compulsion to affirm what is contrary to one's religious belief is the antithesis of freedom of worship." *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 646, 63 S.Ct. 1178, 1189, 87 L.Ed. 1628 (1943) (Murphy, J.; concurring). Under settled principles, therefore, the District of Columbia could not compel the university to state that homosexuality is as legitimate a "lifestyle" or human activity as is political organizing, or advocating or promoting the rights of women. As applied to this case, the university cannot be compelled to equate gay rights groups formed to promote homosexuality, with student groups like the Young Americans for Freedom, the Democratic Socialist Organizing Committee, or the Women's Rights Collective. The majority's conclusion that the university's recognition of these diverse groups somehow undercuts Georgetown's right to refuse to recognize the plaintiffs is in effect an impermissible intrusion into, and weighing of, Catholic doctrine.[5]

The free exercise clause absolutely bars interference with the dissemination of religious ideas. *Gillette v. United States*, 401 U.S. 437, 462, 91 S.Ct. 828, 842, 28 L.Ed.2d 168 (1971). Georgetown chooses to convey its disapproval of homosexuality by refusing to grant "recognition" to student groups who advocate it. There is no doubt that this symbolic speech is a "form of utterance" equally protected by the free exercise clause, *West Virginia Board of Education v. Barnette*, 319 U.S. at 632, 63 S.Ct. at 1182. As the Court held in *Barnette*, "[s]ymbolism is a primitive but effective way of communicating ideas"; it is a "short cut from mind to mind." *Id.*

In *Barnette* the Court struck down a state statute that "require[d] the individual to communicate by word and sign [through a flag salute] his acceptance of the political ideas [the salute] bespeaks." The Court held that the state could not "require[] affirmation of a belief and an attitude of mind"; this type of coercion was "well known to the framers of the Bill of Rights" and was prohibited by the free exercise clause. *Id.* at 633, 63 S.Ct. at 1183. The majority noted that an utterance distasteful on religious grounds that is *compelled* by the state would require even greater justification than the state's suppression of speech. *Id.* at 633–34, 63 S.Ct. at 1182–83. Significantly, the majority in *Barnette* rejected Justice Frankfurter's conclusion, similar to the majority's rationalization here, that no free exercise problem is presented as long as the plaintiffs have an

faith, does not automatically preclude state action that infringes on that conduct," *ante* note 15, is simply wrong, if the majority means to imply that the government may outlaw certain disfavored religious speech or compel an individual to adhere to principles that its religious tenets require it to disavow.

**5.** As the Supreme Court has repeatedly stated, "[i]t is not within 'the judicial function and judicial competence' [] to determine whether [an individual asserting free exercise rights] or the Government has the proper interpretation of the [particular] faith." This is so because "'[c]ourts are not arbiters of scriptural interpretation.'" *United States v. Lee*, 455 U.S. 252, 257, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982) (citing *Thomas v. Review Board*, 450 U.S. 707, 716, 101 S.Ct. 1425, 1431, 67 L.Ed.2d 624 (1981)). As the Court said in *Lee*, "[t]his is not an instance in which the asserted claim is 'so bizarre, so clearly nonreligious in motivation, as *not to be entitled* to protection under the Free Exercise Clause,'" 455 U.S. at 257 n.6, 102 S.Ct. at 1055 n.6 (citation omitted). The majority cites only to Professor Tribe's treatise on constitutional law for the proposition that "the Supreme Court has inquired into whether the religious beliefs are sincerely held" in evaluating free exercise claims. *Ante* note 15. Professor Tribe states, however, that "any such inquiry [into sincerity] can be extraordinarily dangerous" and notes that "the very rights ostensibly protected by the free exercise clause might well be jeopardized by any but the most minimal inquiry into sincerity." Such a "minimal inquiry" would disallow a free exercise claim when "extrinsic evidence exists to establish that religion is being used as a completely fraudulent cloak." L. Tribe, American Constitutional Law § 14–11, at 861 (1978). Since there is of course no evidence that Georgetown's belief that Catholic doctrine requires it to disavow homosexuality is in any way fraudulent, there would be no occasion here to "inquire into the sincerity" of this belief even if the majority *could* "doubt [its] sincerity," *ante* note 15.

opportunity to disclaim the meaning of the acts or utterances required by the state. *See id.* at 664, 63 S.Ct. at 1197 (Frankfurter, J., dissenting).

*Barnette*'s analysis was reaffirmed by the Court in *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), where a state statute compelling the display of a state motto on license plates repugnant to the plaintiffs' religious beliefs was held invalid as a compulsion of speech. The court again rejected the view of the dissent that a plaintiff may avoid religious interference by disclaiming the message compelled by the state. *See id.* at 722, 97 S.Ct. at 1439 (Rehnquist, J., dissenting). The majority here rejects *Wooley,* for reasons that are not readily apparent. The dissenting Justice in *Wooley* would have upheld the statute because it did not force the plaintiffs "to communicate ideas with nonverbal actions reasonably likened to 'speech,'" *id.* at 720, 97 S.Ct. at 1438, and in view of the uniform state license plate requirement it was unlikely that anyone would impute the message found on the plates to the plaintiffs. The statute at issue here, however, under the majority's interpretation, would compel the university to pay lip service to an idea that as a Catholic entity it is required to disavow: that the goals and behavior of gay rights groups are as valid as those of all other student groups. This compelled speech, together with the majority's holding that the plaintiff groups must be permitted to use the Georgetown name, would have the effect of imputing the approval of homosexual behavior to the university.

The majority relies on *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), but the question presented in *PruneYard* was whether the owners of a shopping center set up as a public forum could refuse to allow the center to be used as a forum for the speech of others. There is no agreement, however, as to whether even a *public* university may be characterized as a public forum equivalent to a shopping center, *see Widmar v. Vincent,* 454 U.S. 263, 277–81, 102 S.Ct. 269, 278–80, 70 L.Ed.2d 440 (1981) (Stevens, J., concurring). In any event, the university does not ask that it be permitted to deny the plaintiff student groups a forum. It simply declines to allow the use of the Georgetown name by these groups, and refuses to indicate in other ways that it approves of, or even tolerates, their message. Had the plaintiffs argued in *PruneYard* that along with their first amendment right to distribute literature in the PruneYard shopping center, they were entitled to use the PruneYard name, I have no doubt that their argument would have been rejected out of hand.[6]

Finally, the majority relies on *Bob Jones v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983) in support of the proposition that the state interest in the abolition of discrimination against homosexual groups is "compelling" and outweighs Georgetown's right to religious expression under the free exercise clause. *Bob Jones* is irrelevant to this case, for two reasons. First, the question there was whether the government could withhold a benefit—a tax preference—to a school that engaged in discrimination. A long line of cases holds that "those who take advantage of [the government's] opportunities may not on ground of conscience refuse compliance with such conditions" that government may choose to impose on the grant of those opportunities or benefits. *Barnette, supra,* 319 U.S. at 632, 63 S.Ct.

---

**6.** The majority contends that the University's claim "is substantially undermined by [its] willingness to tolerate, as consistent with Roman Catholic teachings, student body endorsement of gay rights groups with attendant use of the University's facilities and name." *Ante* at 580. There is nothing in the record to indicate, however, that the Georgetown student government is given permission by the University to approve or authorize the use of the Georgetown name by student groups. Moreover, even if student body endorsement could be construed as such an authorization, the University would in no sense be estopped by student government action from requesting that a particular group cease its use of the Georgetown name.

at 1182. These types of cases are distinguished from outright government burdens on free exercise like the one imposed by the majority here, *id. See also In re Summers*, 325 U.S. 561, 572–73, 65 S.Ct. 1307, 1313–14, 89 L.Ed. 1795 (1945); *Hamilton v. Regents*, 293 U.S. 245, 261–65, 55 S.Ct. 197, 203–05, 79 L.Ed. 343 (1934); *United States v. MacIntosh*, 283 U.S. 605, 51 S.Ct. 570, 75 L.Ed. 1302 (1931).[7] The majority's conclusion that *Bob Jones* sets out a framework for the analysis of *all* government action that infringes upon free exercise rights, *ante* at 575, is an extrapolation that is entirely too broad.

Second, the "compelling government interest" in *Bob Jones* was *constitutionally* based and its outlines were clear. The Court noted that "[o]ver the past quarter of a century, every pronouncement of this Court and myriad Acts of Congress and Executive Orders attest a firm national policy to prohibit racial segregation and discrimination" in education. *Id.*, 461 U.S. at 593, 103 S.Ct. at 2029. Emphasized in the

opinion is the fact that the interest in question is embraced within the concept of due process of law under the Constitution. *Id.* In contrast, the District's asserted interest in preventing discrimination on the basis of sexual preference has no similar historical or constitutional underpinnings.[8] The majority's equation of discrimination on the basis of race and discrimination on the basis of sexual preference, in light of the constitutional history that forms the basis for the decision in *Bob Jones, see ante* at 575, is far-fetched.[9]

In summary, I would reject the motion court's finding that the withholding of university recognition to the plaintiffs violates the Human Rights Act. I would interpret the Act to exclude the requirement of neutrality of thought that is now forced upon the university by a judicial construction that is without precedent. I would then proceed to a balancing analysis to determine whether Georgetown's interest in denying the privileges incidental to recogni-

7. The majority states that the balancing test is "an objective one; it is not linked exclusively to the subjective position of the party asserting, or challenging, a religious viewpoint. If it were, Bob Jones University would have prevailed...." *Ante* at 581. On the contrary, the Court in *Bob Jones,* consistent with the analysis in every other free exercise case, did not question the authenticity of the university's religious beliefs and its "right to interpret and apply its religious tenets as it sees fit," *ante* at 580. *See supra* note 5. The Court noted that the "sponsors of the University genuinely believe that the Bible forbids interracial dating and marriage." 461 U.S. at 580, 103 S.Ct. at 2022. It did not presume, as does the majority here, to engage in an independent assessment of the university's beliefs—weighing them "objectively" against the university's actions in other, entirely different, contexts—to determine if they are sincerely held. As noted *supra, Bob Jones* held only that fundamental public policy requires the denial to a university that discriminates on the basis of race of a tax benefit normally conveyed only to institutions "thought beneficial to the social order of the country as a whole." 461 U.S. at 588, 103 S.Ct. at 2026. The decision in *Bob Jones* gave that university a choice: relinquishing its tax benefit or foregoing the effects of its sincerely held religious belief, its prohibition on inter-*racial dating. In* contrast, today's decision *eliminates* choice, while simultaneously restricting

religious speech: Georgetown is foreclosed from conveying its disapproval of the gay student organization plaintiffs.

8. The majority states that in this case, "as in *Bob Jones,* ... conflicting individual rights are alleged—here, freedom from unlawful discrimination and free exercise of religion." *Ante* at 579. The obvious distinction between these two "individual rights"—the constitutional basis for one and the purely statutory basis for the other—is nowhere recognized and indeed is obfuscated by the majority.

9. Few social or political issues in our history have been more vigorously debated and more extensively ventilated than the issue of racial discrimination, particularly in education. Given the stress and anguish of the history of efforts to escape from the shackles of the "separate but equal" doctrine of *Plessy v. Ferguson,* 163 U.S. 537 [16 S.Ct. 1138, 41 L.Ed. 256] (1896), it cannot be said that educational institutions that, for whatever reasons, practice racial discrimination, are institutions exercising "beneficial and stabilizing influences in community life," *Walz v. Tax Comm'n,* 397 U.S. 664, 673 [90 S.Ct. 1409, 1413, 25 L.Ed.2d 697] (1970), or should be encouraged by having all taxpayers share in their support by way of special tax status.
*Bob Jones,* 461 U.S. at 595, 103 S.Ct. at 2030.

tion[10]—which seem, in their entirety, to be a mailbox, mailing privileges and easier access to university meeting-places—[11] is outweighed by the District's interest in the enforcement of its statute. The route which the majority takes today—the holding that recognition may not be withheld under the Act, along with the suggestion to Georgetown that it simply "disclaim" any connection between it and the plaintiffs—seems to me to be an invitation to additional litigation. I accordingly dissent.

---

10. Whether the university would be willing to grant these incidental privileges absent a requirement that it recognize the student groups is not clear from the record.

11. The question of funding has not been raised at this stage and I therefore do not address it.